Richard ROSARIO, Petitioner,

v.

Superintendant Robert ERCOLE, Respondent.

No. 05 Civ. 8072(PKC).

United States District Court, S.D. New York.

Oct. 22, 2008.

---

Carl Hanline Loewenson, Jr., Jodi Kim Miller, Morrison & Foerster LLP, Jin Hee Lee, NAACP Legal Defense & Educational Fund, Inc., New York, NY, Petitioner.

*MEMORANDUM AND ORDER*

P. KEVIN CASTEL, District Judge:

Following a jury trial in the New York Supreme Court, Bronx County, petitioner Richard Rosario was convicted of one count of murder in the second degree under New York Penal Law Section 125.25. The trial court sentenced Rosario to a term of imprisonment of 25 years to life, pursuant to which he currently is incarcerated. He directly appealed his judgment and conviction to the New York Supreme Court Appellate Division, First Department, *People v. Rosario*, 288 A.D.2d 142, 733 N.Y.S.2d 405 (1st Dep't 2001), and on March 26, 2002, was denied leave to review by the New York Court of Appeals. *People v. Rosario*, 97 N.Y.2d 760, 742 N.Y.S.2d 621, 769 N.E.2d 367 (2002) (table). On September 16, 2005, Rosario filed this petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254.

The habeas petition asserts four grounds for relief. First, he asserts that he was denied the effective assistance of counsel pursuant to *Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). Second, he asserts that the trial court incorrectly ruled that he failed to establish a *prima facie* case of discrimination pursuant to *Batson v. Kentucky*, 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986). Third, he asserts that the trial court deprived him of a due process right to a fair trial by improperly admitting extrinsic evidence of prior incarceration. Fourth, he asserts that he is actually innocent of the crime for which he was convicted.

I referred the petition to Magistrate Judge Henry B. Pitman on December 29, 2005. In a thorough, 107–page Report and Recommendation (the "R & R") dated December 28, 2007, Magistrate Judge Pitman recommended that Rosario's petition be conditionally granted as to his *Batson* claim and denied in all other respects. Both the petitioner and respondent have filed objections to the R & R.

I have reviewed the R & R *de novo*. R. 72(b), Fed.R.Civ.P.; 28 U.S.C. § 636(b)(1). For the reasons explained below, I modify the R & R to the extent that it conditionally recommends granting the petitioner's *Batson* claim. I adopt the R & R in all other respects. The petition is denied.

*Background*

On June 19, 1996, George Collazo was fatally shot in the head on Turnbull Avenue in Bronx County, New York. (Trial Tr. at 19.) At least three eyewitnesses observed the incident, (Trial Tr. at 54–56, 133–66, 286–94.) though only two of them testified that Rosario was the shooter. One witness, Michael Sanchez, was a friend of the victim and present with him at the time of the shooting. (Trial Tr. at 137–65, 286–94.) He testified that an ar-

gument arose between Rosario and the victim after the victim uttered a racial epithet, and stated that he had a clear and unobstructed view of Rosario's face during the verbal quarrel. (Trial Tr. at 139–50.) According to Sanchez, Rosario approached from behind shortly thereafter, and shot the victim with a revolver. (Trial Tr. at 152–55.) Three weeks after the shooting, a police lineup was organized, and Sanchez identified Rosario as the shooter. (Trial Tr. at 164–65.) At trial Sanchez again identified Rosario as the shooter, and stated that he had no doubt, either at the lineup or at trial, that his identification of Rosario was correct. (Trial Tr. at 165.) A second witness, Richard Davis, identified Rosario as the shooter after reviewing photographs provided by police; he testified at trial that he had an unobstructed view of the shooting. (Trial Tr. at 53–66.) A third witness, Jose Diaz, testified that he heard the fatal shot and stated that he might be able to recognize the persons involved in the dispute preceding the shooting, but he did not identify Rosario in the courtroom. (Trial Tr. at 292–96.)

Two alibi witnesses—Jenine Seda and John Torres—testified at trial that Rosario was with them in Florida on the day of the shooting. (Trial Tr. at 305–09.) Seda testified that she specifically recalled Rosario's presence in her home, because the date of the shooting was one day before she gave birth to a son, and she further testified that Rosario was present in her home when she returned from the hospital. (Trial Tr. at 328, 334–35.) John Torres, Rosario's friend and the father of Seda's baby, testified at trial that on the day of the shooting, Rosario had spent the day with him purchasing auto parts for a broken-down car. (Trial Tr. at 347.) Rosario also offered the testimony of a New York terminal manager for Greyhound Busline, who authenticated and explained a "readout of a transaction" dated June 30, 1996, indicating that Rosario had purchased bus tickets from Orlando, Florida to New York City. (Trial Tr. at 366–69.) The terminal manager also testified that passengers generally are not required to submit identification when they pay and board, and are not required to use the ticket on its date of purchase. (Trial Tr. at 371–72.)

Rosario testified in his own defense, and asserted that he was present in Florida from late May through June 30, 1996, during which he hoped to find work and ultimately relocate. (Trial Tr. 399–400.) Rosario further testified that his New York fiancée Minerva Godoy wired money to him in Florida via Western Union at least three times, and that the transfers were addressed to John Torres because Rosario himself lacked valid, government-issued identification. (Trial Tr. at 422–24.) He stated that he resided with John Torres and Jenine Seda until after the birth of their child on June 20, 1996 (Trial Tr. at 409–10); that he and John Torres spent a day looking for auto parts together, even though he could not recall the precise date (Trial Tr. at 419.); and that he returned to New York from Florida on June 30, 1996, upon hearing from his sister that detectives wished to speak to him in connection with the Collazo shooting. (Trial Tr. at 388–89.)

In rebuttal, the prosecution offered the testimony of Captain Bruce Bolton, records custodian of the Department of Corrections in Volusia County, Florida. Bolton testified that the Department's records showed that Rosario was in Department custody from March 13, 1996, through April 12, 1996. (Trial Tr. at 451.) Prior to this testimony, Rosario's counsel objected that the rebuttal evidence would be unduly prejudicial, and that Rosario was never directly questioned about his incarceration, such that Bolton's testimony constituted extrinsic evidence on a collateral matter.

(Trial Tr. a 435–38.) The objection was overruled. (Trial Tr. at 438–39.)

The jury found Rosario guilty of murder in the second degree. (Trial Tr. at 595–98.)

*Standard of Review*

Under 28 U.S.C. § 2254, as amended by the Antiterrorism and Effective Death Penalty Act of 1996, Pub.L. No. 104–132, 100 Stat. 1218 ("AEDPA"), federal courts must accord deference to the state court's determination of a habeas petitioner's claims. A federal court should not grant habeas relief to a person in custody pursuant to a state court judgment unless the state proceedings "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States." 28 U.S.C. § 2254(d)(1). "[T]he meaning of the phrase 'clearly established Federal law, as determined by the Supreme Court of the United States' ... refers to the holdings, as opposed to the dicta, of [the Supreme] Court's decisions as of the time of the relevant state-court decision." *Williams v. Taylor*, 529 U.S. 362, 412, 120 S.Ct. 1495, 146 L.Ed.2d 389 (2000).

I. *Pursuant to the Standard of Review Set Forth by AEDPA, the R & R is Adopted, and Petitioner's Ineffective Assistance Claim is Dismissed*

In support of his claim that he received ineffective assistance of counsel in violation of the Sixth Amendment to the U.S. Constitution, Rosario argues that his trial counsel failed to undertake a sufficient investigation of his alibi defense, and neglected to seek out relevant and readily available witnesses and documentary evidence that established his presence in Florida on the date of Collazo's shooting. He contends that counsel's actions were based in error and neglect, rather than conscious strategic decisions.

Rosario's ineffective assistance claim is directed toward two of the four attorneys who represented him between his arrest and jury trial. Joyce Hartsfield represented Rosario from mid-July 1996 through mid-February 1998. (Hearing Tr. at 13–14, 117.) Steven J. Kaiser then represented Rosario through the conclusion of trial. (Hearing Tr. at 117.) The R & R recommended that I dismiss Rosario's ineffective assistance claim based on the standard of review set forth in Section 2254(d)(1). For the reasons explained below, I adopt the R & R's recommendation.

A. *At Rosario's Post–Conviction 440.10 Hearing, Several Alibi Witnesses Testified that He was Present in Florida During June 1996*

The R & R thoroughly and carefully sets forth the events and testimony relevant to the ineffective assistance claim. I briefly recount them here.

Following Rosario's unsuccessful direct appeal of his judgment and conviction, he filed a motion to vacate his judgment of conviction pursuant to Section 440.10 of the New York Criminal Procedure Law, arguing that he had been denied effective assistance of counsel in regard to his alibi defense. An evidentiary hearing was conducted before the Honorable Edward M. Davidowitz, Justice of the Supreme Court, Bronx County. In total, the 440.10 hearing included testimony from ten witnesses, including seven alibi witnesses, attorneys Kaiser and Hartsfield, and the private investigator that Hartsfield retained. Rosario was represented by counsel and presented his ineffective assistance case at length. (Miller Dec. Ex. 61.)

The R & R concluded that Rosario exhausted his ineffective assistance claim in state court (R & R at 568–69), a conclusion that I adopt.

At the section 440.10 hearing, Hartsfield testified that she sought no documentary records to support Rosario's alibi defense, including, among other things, money transfer records from Western Union that subsequently were destroyed pursuant to Western Union's routine expunging of business records. (Hearing Tr. at 28, 32; Miller Ex. 53.) Hartsfield did, however, retain an investigator named Jessie Franklin, for the purpose of locating and interviewing prospective alibi witnesses. (Hearing Tr. at 42–43.) Franklin spoke to Fernando Torres (father of trial alibi witness John Torres) and Robert Torres (John's brother). (Activity Log of Jessie Franklin, attached at Miller Dec. Ex. 17.) On April 16, 1997, Hartsfield successfully applied to the court for funds to further investigate the alibi defense, (Miller Dec. Ex. 29) and yet for reasons that are not entirely clear, pursued no subsequent investigation. She implied that logistical concerns and unawareness of funding availability both may have influenced her actions. (Hearing Tr. at 50.) Hartsfield stated that there was no conscious strategic decision not to press forward with investigating Rosario's alibi defense:

Q. Miss Hartsfield, while you were representing Mr. Rosario, did you make a conscious strategic decision not to contact any particular witness?

A. No.

Q. And while you were representing Mr. Rosario, did you make a conscious strategic decision not to pursue any particular evidentiary leads?

A. No.

(Hearing Tr. at 73.) In objecting to the R & R, the respondent also notes the following testimony from Hartsfield:

Q. And you didn't have a strategic reason not to send [Jessie Franklin] during that year [to Florida], did you?

A. Not that I can recall, no, no.

(Hearing Tr. at 52.) Hartsfield did, however, testify that a successful alibi defense relied on witness credibility, and that a non-credible witness could jeopardize the defense. (Hearing Tr. at 95.) When asked whether John Torres and Jenine Seda were the best possible witnesses to provide alibi testimony, Hartsfield stated that she was "not in a position to make that evaluation." (Hearing Tr. at 95.)

Hartsfield's successor, Kaiser, stated via affirmation that Hartsfield indicated to him that the court had not authorized funds for a Florida investigation, (Miller Dec. Ex. 50)[1] but then submitted a second affirmation retracting his assertion that Hartsfield told him about a lack of funds, noting that his "recollection is presently unclear" about the source of his misimpression concerning the availability of investigation funds. (Miller Dec. Ex. 52.) He affirmed that he nevertheless attempted to locate and contact alibi witnesses in Florida. (Miller Dec. Ex. 52.) As to the decision not to present additional alibi witnesses, he testified at the 440.10 hearing that he was under an impression that John Torres's parents, Fernando and Margarita, seemed unwilling to travel to New York on grounds of expense, and generally seemed reluctant to serve as witnesses. (Hearing Tr. at 192–95.) He further testified that additional witnesses merely may have duplicated the testimony of John Torres and Jenine Seda in a less-cooperative manner. (Hearing Tr. at 196, 276–78.) He stated that John Torres and Jenine Seda seemed like the best possible witnesses because

---

1. Hartsfield stated via affidavit that she did not recall making this representation to Kai- ser. (Miller Dec. Ex. 51.)

they could establish the date of Rosario's presence, and had no prior convictions that would leave them vulnerable to impeachment. (Hearing Tr. at 196, 221, 225.) He noted at trial that they "weren't impeached in any way as being bad characters." (Hearing Tr. at 196.) He did, however, state that he would have preferred to call additional alibi witnesses, including those who did not live with Rosario. (Hearing Tr. at 196–98.) Kaiser testified at the hearing that he was under the impression that funds for an investigation had been denied, so he made no effort to pursue one. (Hearing Tr. at 128–29, 133, 210–11.)

Jessie Franklin, the investigator that Hartsfield retained to pursue Rosario's alibi defense, also testified at the hearing. Her notes reflected that she held an hour-long meeting with Rosario, who provided contact information for John Torres, Robert Torres, Chenoa Ruiz, Ricardo Ruiz, Nerida Colon and Denise Hernandez. (Miller Dec. Ex. 19.) She stated that prior to drafting an affidavit supporting a grant of additional investigation funds, she had contacted only two potential witnesses, Fernando and Robert Torres. (Hearing Tr. at 384–85, 403–04.) Both men indicated to her that they saw Rosario in Florida in late June 1996. (Hearing Tr. 391–92, 437–38; Notes of Jessie Franklin, attached at Miller Dec. Ex. 21.) Franklin did not subsequently contact Fernando or Robert Torres, and assumed that the request for investigation funds had been denied in light of lack of communication from Hartsfield. (Hearing Tr. at 403, 407.) She later resumed the investigation, contacted Jenine Seda and John Torres, and was told by John Torres that he could provide names of other alibi witnesses. (Hearing Tr. at 411–14.) Franklin attempted to contact others named by Rosario, but was unsuccessful. (Hearing Tr. at 415–17.) She testified that Kaiser never contacted her as to the investigation. (Hearing Tr. at 421–22.)

Several alibi witnesses provided testimony stating that Rosario was present in Florida in or around late June 1996. Fernando Torres testified that on the day of Collazo's murder, he accompanied Rosario and John Torres on trips to buy auto parts, and that he did not know until several years after the fact the crime for which Rosario was convicted occurred on June 19, 2006. (Hearing Tr. at 318–19, 364, 371–72, 374–75.) He then submitted a post-hearing statement stating that he saw Rosario in John Torres's apartment on June 19. (Miller Dec. Ex. 56.) Chenoa Ruiz, a next-door neighbor to John Torres and Jenine Seda, testified that she observed Rosario on both June 18 and June 19, and recalled frequently feeling irritated with Rosario because he so often was "hanging out" with John Torres, who she believed should have been tending to Seda's pregnancy. (Hearing Tr. 497, 503, 527.) Rosario also was memorable to her, she added, because he often kept her boyfriend out late at night, which caused her problems. (Hearing Tr. at 527.) She stated that she specifically observed Rosario at the home of John Torres and Jenine Seda on June 19, when she picked up Seda for a doctor's appointment. (Hearing Tr. at 548, 550.) She stated that she was not contacted by any attorney for Rosario until after his conviction, and that she would have been willing to testify at his trial. (Hearing Tr. at 509–10.) Michael Serrano testified that he recalled Rosario being present when John Torres returned from the hospital after Seda gave birth on June 20—one day after Collazo's shooting. (Hearing Tr. 719–20.) Various other witnesses testified that they observed Rosario in Florida in June 1996, and the R & R summarizes their testimony in detail. (R & R at 572–74, summarizing testimony of Ricardo Ruiz Minerva Godoy, Denise Hernandez and Lisette Rivera.)

B. *Following the 440.10 Hearing, Rosario's Motion for Relief Based on Ineffective Assistance was Denied in the New York Supreme Court, Bronx County*

Justice Davidowitz issued a 22–page opinion denying post-conviction relief. (Miller Dec. Ex. 62.) He summarized the testimony provided by witnesses at the 440.10 hearing. (Miller Dec. Ex. 62 at 7–15.) Justice Davidowitz ruled that Rosario received effective representation pursuant to the constitutions of the United States and the State of New York, and evaluated effectiveness pursuant to New York's "meaningful representation" standard set forth in *People v. Benevento,* 91 N.Y.2d 708, 674 N.Y.S.2d 629, 697 N.E.2d 584 (1998), and *People v. Baldi,* 54 N.Y.2d 137, 444 N.Y.S.2d 893, 429 N.E.2d 400 (1981). His opinion noted that it was "relevant, but not dispositive" whether, but-for counsel's errors, Rosario would have been acquitted. (Miller Dec. Ex. 62 at 15.) The opinion noted that "meaningful representation" is assessed in a broad context and considers the attorney's performance during the entire course of representation. (Miller Dec. Ex. 62 at 16–17.) Justice Davidowitz held that any error concerning the availability of investigation funds was due to "a misunderstanding or a mistake" and was not deliberate, (Miller Dec. Ex. 62 at 18) and also emphasized that two alibi witnesses testified at Rosario's criminal trial. (Miller Dec. Ex. 62 at 18–19.) He considered John Torres and Jenine Seda the most credible among the possible alibi witnesses, and concluded that the other prospective witnesses, "studied closely, were, for the most part, questionable and certainly not as persuasive as the two witnesses who did testify, and were rejected by the jury." (Miller Dec. Ex. 62 at 21–22.) On September 8, 2005, the Appellate Division denied leave to appeal Justice Davidowitz's decision. (Miller Dec. Ex. 63.)

C. *AEDPA's Deferential Standard of Review Requires Dismissal of Rosario's Ineffective Assistance Claim*

■ An ineffective assistance claim is determined under the well-known criteria of *Strickland v. Washington,* 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). *Strickland* established a two-prong analysis for considering such a claim. The first considers whether counsel's performance was objectively unreasonable. Any errors by counsel must be "so serious that counsel was not functioning as 'counsel' guaranteed the defendant by the Sixth Amendment." *Id.* at 687, 104 S.Ct. 2052. Second, the petitioner must establish prejudice, as *Strickland* requires "that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable." *Id.* Both error and prejudice must be established. *Id.*

■ "The essence of an ineffective-assistance claim is that counsel's unprofessional errors so upset the adversarial balance between defense and prosecution that the trial was rendered unfair and the verdict rendered suspect." *Kimmelman v. Morrison,* 477 U.S. 365, 374, 106 S.Ct. 2574, 91 L.Ed.2d 305 (1986). Scrutiny of counsel's performance "must be highly deferential" and avoid hindsight. *Strickland,* 466 U.S. at 689, 104 S.Ct. 2052. The petitioner bears the burden of proof to establish a constitutional violation in a habeas corpus proceeding. *Zappulla v. New York,* 391 F.3d 462, 489 n. 19 (2d Cir.2004).

■ "An ineffective assistance claim asserted in a habeas petition is analyzed under the 'unreasonable application' clause of AEDPA because it is 'past question that the rule set forth in *Strickland* qualifies as clearly established Federal law, as determined by the Supreme Court of the United States ...' " *Lynn v. Bliden,* 443 F.3d 238, 247 (2d Cir.2006) (quoting *Williams,* 529

U.S. at 391, 120 S.Ct. 1495, *cert. denied,* 549 U.S. 1257, 127 S.Ct. 1383, 167 L.Ed.2d 168 (2007)). The petitioner must do more than "convince a federal habeas court that, in its independent judgment, the state court applied *Strickland* incorrectly. Rather, he must show that the [state court] applied *Strickland* to the facts of his case in an objectively unreasonable manner." *Cox v. Donnelly,* 387 F.3d 193, 197 (2d Cir.2004) (alteration in original) (quoting *Bell v. Cone,* 535 U.S. 685, 698–99, 122 S.Ct. 1843, 152 L.Ed.2d 914 (2002)). "Unreasonableness is determined by an objective standard," *Gersten v. Senkowski,* 426 F.3d 588, 607 (2d Cir.2005), *cert. denied,* 547 U.S. 1191, 126 S.Ct. 2882, 165 L.Ed.2d 894 (2006), and therefore "a federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly." *Gilchrist v. O'Keefe,* 260 F.3d 87, 93 (2d Cir.2001) (quoting *Williams,* 529 U.S. at 411, 120 S.Ct. 1495). The state court's application of federal law must reflect " '[s]ome increment of incorrectness beyond error,' " *Gersten,* 426 F.3d at 607 (alteration in original) (quoting *Henry v. Poole,* 409 F.3d 48, 68 (2d Cir.2005)), although the increment "need not be great; otherwise, habeas relief would be limited to state court decisions so far off the mark as to suggest judicial incompetence." *Yung v. Walker,* 341 F.3d 104, 110 (2d Cir.2003) (quoting *Francis S. v. Stone,* 221 F.3d 100, 111 (2d Cir.2000)).

In a careful and detailed analysis, the R & R independently concluded that both prongs of the *Strickland* test had been violated, (R & R at 576–81) before recommending dismissal of petitioner's ineffectiveness claim pursuant to AEDPA and the law of the Second Circuit. (R & R at 581–85.) I adopt Magistrate Judge Pittman's recommendation that AEDPA requires dismissal of petitioner's *Strickland* claim.

As Rosario points out, the law of the State of New York does not analyze ineffectiveness claims pursuant to the *Strickland* framework. Instead, New York law looks to whether a defendant received "meaningful representation" during the process as a whole. *Benevento,* 91 N.Y.2d at 713–14, 674 N.Y.S.2d 629, 697 N.E.2d 584. As noted by the R & R, Justice Davidowitz evaluated counsel's performance pursuant to "a number of issues routinely considered by New York courts in analyzing whether or not counsels' errors amounted to ineffective assistance, such as did counsel perform competently in other respects and were counsels' errors so seriously prejudicial as to compromise a defendant's right to a fair trial." (R & R at 582 (collecting cases).) The R & R summarized Justice Davidowitz's conclusions, noting that Rosario's counsel filed all appropriate motions, competently examined witnesses and presented competent opening and closing statements, and offered a credible alibi defense. (R & R at 582.) The R & R also noted Justice Davidowitz's conclusion that the alibi witnesses not called at Rosario's criminal trial were less persuasive than John Torres and Jenine Seda. (R & R at 582.)

▮▮▮ First, I address whether the state court decision was "contrary to" *Strickland.* A state court decision is "contrary to" federal law if it is "diametrically different" from, "opposite in character or nature" to, or "mutually opposed to" relevant Supreme Court precedent. *Williams,* 529 U.S. at 405, 120 S.Ct. 1495. The Second Circuit has held that New York's standard of "meaningful representation" is not "contrary to" *Strickland's* interpretation of the Sixth Amendment. *See, e.g., Eze v. Senkowski,* 321 F.3d 110, 123–24 (2d Cir.2003); *Lindstadt v. Keane,*

239 F.3d 191, 198 (2d Cir.2001). As noted, the Second Circuit also has indicated that a habeas petition raising *Strickland* is subject to "unreasonable application" analysis, and not the "contrary to" criteria set forth in AEDPA. *Lynn*, 443 F.3d at 247.

The R & R notes language from *Henry*, which appeared to question whether New York's approach to ineffectiveness necessarily satisfies *Strickland's* prejudice prong. A relevant portion of *Henry* observes:

> [I]n light of the *Strickland* principle that an ineffective assistance claim is established if the court concludes that there is a reasonable probability that but for counsel's professional deficient performance the outcome of the proceeding would have been different, we find it difficult to view so much of the New York rule as holds that *"whether defendant would have been acquitted of the charges but for counsel's errors is . . . not dispositive,"* as not "contrary to" the prejudice standard established by *Strickland.*

*Henry*, 409 F.3d at 71 (emphasis and ellipses in original; citations omitted). *Henry* also noted that the New York standard considers the fairness of the process as a whole, while *Strickland's* prejudice prong focuses on whether attorney insufficient performance was outcome-determinative. *Id.* at 69. Rosario contends that this potential divergence between the Sixth Amendment of the U.S. Constitution and New York's ineffective assistance standard resulted in a decision contrary to *Strickland*, pursuant to 28 U.S.C. § 2254(d)(1).

While *Henry* may or may not portend an eventual differentiation between *Strickland* and New York's ineffectiveness standard, the R & R correctly noted that both *Henry*, 409 F.3d at 70, and *Eze*, 321 F.3d at 123–24, held that in absence of a contradictory holding by either the Supreme Court of the United States or the Second Circuit sitting *en banc*, the courts of this Circuit remain bound by the holding of Lindstadt, which concluded that the New York standard does not run afoul of *Strickland*. *See* 239 F.3d at 198. Justice Davidowitz also held that the jury's guilty verdict was supported by the trial record, a consideration consistent with *Strickland's* prejudice prong. *Strickland*, 466 U.S. at 696, 104 S.Ct. 2052. Thus, as the R & R properly observed, the state court believed that the prosecution's case was sufficiently strong that the trial outcome would have been the same, even if additional alibi evidence had been offered. (R & R at 583–84.)

■ Second, I conclude that the state court decision was not an "unreasonable application" of *Strickland*. Under the "unreasonable application" prong of Section 2254(d)(1), a federal court may grant relief when a state court " 'correctly identifies the governing legal principle from [Supreme Court] decisions but unreasonably applies it to the facts of a particular case.' " *Harris v. Kuhlmann*, 346 F.3d 330, 344 (2d Cir.2003) (quoting *Bell v. Cone*, 535 U.S. 685, 694, 122 S.Ct. 1843, 152 L.Ed.2d 914 (2002)). Though the terminology employed by the state court varies from *Strickland*,[2] I cannot conclude that it amounted to an unreasonable appli-

---

2. For example, as Rosario points out in his objections to the R & R the state court's opinion noted the diligence and integrity of counsel in matters of representation unrelated to the alibi defense. (Petitioner's Objections to the R & R at 564–65.) While such considerations would not arise under a *Strickland*

analysis, their presence in the state court opinion does not, in itself, render the state court's analysis unreasonable under 2254(d)(1). To conclude otherwise would be a failure to apply *Eze*, 321 F.3d at 123–24, and *Lindstadt*, 239 F.3d at 198.

cation of federal law. 28 U.S.C. § 2254(d)(1). Justice Davidowitz concluded that the performance of Rosario's counsel was not objectively unreasonable, and that the reliability of the trial's outcome of the jury trial was not jeopardized by the performance of his legal counsel. He noted that "most importantly, a credible alibi defense was presented to the jury." (Miller Dec. 62 at 17.) He concluded that John Torres and Chenoa Ruiz were strong alibi witnesses because their memory of the defendant's presence in Florida was related to the birth date of their son. (Miller Dec. Ex. 62 at 18–19.) He also noted inconsistencies presented in the testimony of Fernando Torres. (Miller Dec. Ex. 62 at 19.) Though not delivered in *Strickland* terminology, the state court opinion ruled that 1.) Rosario was effectively represented in his alibi defense, and 2.) that his representation did not undermine confidence in the jury's verdict.

█ A cold reading of the testimony at the 440.10 hearing does not point to only one clear conclusion concerning the possible impact of calling Chenoa Ruiz and Fernando Torres at trial. Yet the record does not support the conclusion that the state court's fact-finding was objectively unreasonable. A state court's findings of fact are presumed to be correct, and can be rebutted only by clear and convincing evidence produced by the petitioner. *Lynn*, 443 F.3d at 246–47. A district court is not free to engage in *de novo* review of state-court fact-finding. *Price v. Vincent*, 538 U.S. 634, 638–39, 123 S.Ct. 1848, 155 L.Ed.2d 877 (2003).

Justice Davidowitz considered testimony from ten witnesses, recorded in more than 750 pages of hearing transcripts. (Miller Dec. Ex. 61.) His opinion included first-hand observations as to witness credibility and the comparative persuasiveness of the various witnesses presented, and, while not employing the terminology commonly used in a *Strickland* analysis, nevertheless found that 1.) counsel's handling of the alibi defense was not ineffective, and 2.) counsel's performance did not undermine the reliability of the trial's outcome. In light of Justice Davidowitz's opinion and the record before me, I cannot hold that this conclusion was an unreasonable application of *Strickland*.

I therefore adopt the R & R's recommendation that Rosario's ineffective assistance claim be dismissed.[3]

## II. The R & R is Modified as to Petitioner's Batson Claim, Which is Dismissed

Jury selection in Rosario's trial occurred in three rounds. It is undisputed that, before the second round concluded, the prosecutor exercised six peremptory strikes, and that all six were exercised against African–American members of the jury pool. Petitioner then raised an objection pursuant to *Batson v. Kentucky*, 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986), and the following exchange occurred:

MR. KAISER: Judge, most respectfully, and I hate to do it, but it's reached the point now where I notice a pattern

---

**3.** The R & R evaluated whether Rosario's representation satisfied both *Strickland* prongs. (R & R at 576–81.) It concluded that it did not. However, as the R & R correctly recognized, a petitioner "must do more than show that he would have satisfied *Strickland's* test if his claim were analyzed in the first instance, because under § 2254(d)(1), it is not enough to convince a federal habeas

court that, in its independent judgment, the state-court decision applied *Strickland* incorrectly." *Bell*, 535 U.S. at 698–99, 122 S.Ct. 1843. Rather, in order to grant habeas relief, *Strickland* must be applied objectively unreasonable manner. *Id.* The state court's ruling was not objectively unreasonable, and survives scrutiny under AEDPA.

of challenges that are consistent only by one factor and that's the race of the person that's being challenged, all of whom are black. Every single one of them.

Now, granted this is the Bronx and there's a lot of black jurors and there's a couple or few that she didn't take off, but the ones that she did take off without exception are Afro Americans.

THE COURT: Let's see if there is a pattern.

(Whereupon, there is a brief pause in the proceedings.)

THE COURT: I do not see a prima facie case of exercised peremptory challenges by race. The People have exercised six peremptories of Afro Americans and there were four that were not challenged by her, three of whom are jurors, one of them whom you challenged. I deny your challenge.

(Miller Dec. Ex. 65 at 161–62.) The court then corrected itself and stated that five African–American veniremembers went unchallenged by the prosecutor, not four. (Miller Dec. Ex. 65 at 163.) Jury selection resumed. The prosecution exercised five additional peremptory strikes, including one of an alternate juror. (Miller Dec. Ex. 65 at 164, Ex. 66 at 85–88.) Petitioner raised no additional *Batson* objection, and the race of the five additional challenged veniremembers is not reflected in the record.

In his direct appeal to the Appellate Division, First Department, Rosario asserted that because the prosecution exercised all of its first six peremptory strikes against African–American veniremembers, he established a *prima facie* case of discrimination under *Batson*, and that the prosecution should have then been compelled to set forth race-neutral explanations for its challenges. The Appellate Division rejected the argument. *People v. Rosario*, 288 A.D.2d at 143, 733 N.Y.S.2d

405. I adopt the Magistrate Judge's conclusion that the petitioner exhausted his *Batson* claim in state court.

To guard against the discriminatory exercise of peremptory strikes in violation of the Equal Protection Clause of the Fourteenth Amendment, *Batson* and its progeny set forth a three-step framework for evaluating such a claim. First, the party challenging the strikes must establish a prima facie case that its adversary's challenges are race-based. *Batson*, 476 U.S. at 96–97, 106 S.Ct. 1712. Once a prima facie case is made, the party exercising the strikes must provide a race-neutral explanation for its peremptory challenges. *Id.* at 97–98, 106 S.Ct. 1712. The court must then determine whether the challenging party has established that the challenges were race-based. *Id.* at 96, 98, 106 S.Ct. 1712.

▆▆▆▆ The threshold for establishing a prima facie case merely requires "evidence sufficient to permit the trial judge to draw an inference that discrimination has occurred." *Johnson v. California*, 545 U.S. 162, 170, 125 S.Ct. 2410, 162 L.Ed.2d 129 (2005). A trial court weighing the existence of a prima facie case looks to all relevant circumstances, including numerical patterns and the questions and answers offered during the voir dire. *Batson*, 476 U.S. at 96–97, 106 S.Ct. 1712. A *Batson* challenge brought via habeas petition must defeat the "presumption of correctness" afforded to the trial court's first-hand observation of the events in voir dire. *Galarza v. Keane*, 252 F.3d 630, 635 (2d Cir.2001). "[I]t is one thing to conclude that a pattern of strikes is *prima facie* evidence of discrimination; it is a very different thing to hold that the contrary conclusion would be an unreasonable application of *Batson*" *Sorto v. Herbert*, 497 F.3d 163, 174 (2d Cir.2007). Because the habeas petitioner bears the burden of

demonstrating a violation of constitutional rights, if a deficiency in the record makes it impossible to ascertain the existence of discriminatory conduct, the petitioner's claims must be rejected. *Id.* at 172–73. The Second Circuit also has observed that while the burden of showing a prima facie case is not onerous, it safeguards "the traditional confidentiality of a lawyer's reason for peremptory strikes unless good reason is adduced to invade it. . . ." *Id.* at 170 (citing *Miller–El v. Dretke,* 545 U.S. 231, 125 S.Ct. 2317, 162 L.Ed.2d 196 (2005)).

▮ The R & R concluded that the state trial court unreasonably applied federal law in ruling that Rosario failed to establish a prima facie case under *Batson* and recommended that the habeas petition be conditionally granted as to its *Batson* claim. (R & R at 586–93.) It reasoned that "[t]he prosecutor's disproportionate strikes of black jurors, despite the fact that not all blacks were stricken from the jury, was sufficient to raise an inference of discrimination and, therefore, sufficient to establish a *prima facie* case under *Batson*" (R & R at 592–93.) In reaching this conclusion, the R & R relied on *United States v. Alvarado,* 923 F.2d 253 (2d Cir. 1991), and emphasized that at the time Rosario raised his *Batson* objection, six of six peremptories were brought against African–American veniremembers. (R & R at 589–91.)

▮ The Second Circuit often has noted the perils of using a snapshot in time amid an incomplete voir dire when reviewing a *Batson* objection raised in a habeas petition. To ascertain the existence of a prima facie case, "[t]he discharge of this burden may entail a review of prosecutorial strikes over the span of the selection process." *Sorto,* 497 F.3d at 170. This is because, in part, "[t]he need to examine statistical disparities may commend a wait-and-see approach," and because "an early

*Batson* challenge limits the state court's ability to properly assess a prima facie case." *Id.*

In *Overton v. Newton,* 295 F.3d 270, 279 (2d Cir.2002), a *Batson* objection arose partway through voir dire. At the time of the objection, the prosecutor had exercised seven peremptory strikes against African–American veniremembers, whereas three African Americans had been seated as jurors and one African–American veniremember had been struck for cause. *Id.* The state trial court ruled that the petitioner failed to establish a prima facie case. *Id.* The Second Circuit held that because the statistics-based *Batson* objection arose partway through jury selection, it was not unreasonable for the trial court to deny the motion. *Id. Overton* explained the complications of granting habeas relief pursuant to a statistics-based *Batson* objection arising before jury selection completes:

> [T]he trial judge never confronted, and the trial record does not reveal, what the statistics would have shown at the conclusion of jury selection. If those statistics sufficiently established the inference that challenges were based on race, the court could then have implemented the *Batson* process to ensure that impermissible challenges would not be allowed. If, on the other hand, the statistics at the conclusion failed to support a sufficient inference, there would be no need to engage in the process. We cannot say, on this record, that the trial judge's refusal to implement *Batson's* process for testing each questioned challenge midway in the process was an unreasonable application of the *Batson* requirements.

*Id.* at 279–80. *Overton* noted that this caution is particularly warranted when reviewing a state court's *Batson* determinations pursuant to a habeas petition. *Id.* at 280 n. 12. In *Williams v. Burge,* 2005 WL

2429445, at *4–6 (S.D.N.Y. Oct.3, 2005), aff'd, 257 Fed.Appx. 337 (2d Cir.2007) (table), this Court applied *Overton* and held that it was not objectively unreasonable for a state trial court to find no *prima facie* case when a *Batson* objection arose partway through jury selection. Similarly, in *Sorto*, the Second Circuit held that a state court acted reasonably when it denied as premature a *Batson* challenge "after only three peremptory strikes." 497 F.3d at 171.

Subsequent to the R & R in this case, the Second Circuit again affirmed dismissal of a habeas petition raising a statistics-based *Batson* objection prior to the conclusion of jury selection:

> [H]ere, petitioner's *Batson* challenge was denied as premature, she failed to renew the motion, and the status of jury selection at the time of the challenge did not insure that the statistics would establish a *prima facie* case irrespective of what happened during the jury selection process thereafter.

*Brown v. Alexander*, 543 F.3d 94, 103, 2008 WL 4287864, at *7 (2d Cir. Sept.22, 2008). In *Brown*, the defendant's trial counsel argued partway through jury selection that the prosecutor exercised its peremptory strikes in a discriminatory fashion when seven of eight peremptory strikes were used against African–American veniremembers. *Id.* at 98, 98 n. 2, 2008 WL 4287864 at *2, *2 n. 2. The trial court denied the *Batson* challenge, which was never renewed by trial counsel. *Id.* at 98–99, 2008 WL 4287864 at *2–3. The Second Circuit held that the trial court's ruling was not unreasonable. *Id.* at 102–

04, 2008 WL 4287864 at *7–8. In so holding, *Brown* underscored the holdings of *Overton* and *Sorto*, and further illuminated the perils posed to a habeas court reviewing a *Batson* challenge "lodged relatively early in the jury selection process." *Id.* at 102, 2008 WL 4287864 at *6. Of course, because *Brown* post-dates the R & R, it was issued without the benefit of *Brown's* holding and analysis, which makes clear that in many situations, a trial court's " 'wait-and-see' approach" is not an unreasonable application of *Batson*.

As in *Overton*, *Sorto* and *Brown*, the record of jury selection here precludes me from holding that the trial court's ruling was unreasonable. In this instance, the reliance on *United States v. Alvarado*, 923 F.2d 253 (2d Cir.1991), is misplaced. *Alvarado*, which was reviewed under a direct appeal, holds that a defendant successfully establishes a prima facie case under *Batson* when there is significant statistical disparity between the prosecution's challenge rate against minorities and the overall minority composition of the venire. *Id.* at 255. As pointed out by the respondent in his objections to the R & R, *Alvarado's* statistical analysis accounted for minority venirepersons who went unchallenged by the prosecutor, and looked to the overall rate of minority-directed challenges in light of those who were unchallenged. In its statistical analysis, *Alvarado* noted that "the prosecution challenge rate against minorities was 50 percent (three of six) in the selection of the jury of 12, and 57 percent (four of seven) in the selection of the jury of 12 plus alternates." *Id.* at 255.[4]

---

**4.** *Alvarado's* statistical breakdown is brief and somewhat cryptic, so it is worthwhile to point out the statistical analysis of its predecessor opinion, *U.S. v. Alvarado*, 891 F.2d 439, 444 (2d Cir.1989), *vacated on other grounds*, 497 U.S. 543, 110 S.Ct. 2995, 111 L.Ed.2d 439 (1990) (per curiam). *Alvarado* I explicitly rejected the argument that the relevant strike rate looks to the percentage of peremptories directed at minorities (in that case, four minority-striking peremptories out of six peremptories used) as opposed to considering challenges in light of those waived (in that case, four minorities peremptorily struck out of seven minorities in the jury pool). *Id.* The statistical approach of *Alvarado* I was em-

It is true that at the time petitioner raised his *Batson* objection, six of six peremptory strikes had been exercised against African–American veniremembers, while five other African Americans from the pool were unchallenged by the prosecution. (Miller Dec. Ex. 65 at 161–63.) Thus, under *Alvarado,* the relevant focus is that six of 11—or slightly less than 55 percent—African-American veniremembers were challenged, not that 100 percent of peremptory challenges were brought against African–American veniremembers. The transcript of jury selection indicates that at the time of the *Batson* objection, there were 11 African–American veniremembers in a pool of 21 potential jurors, excluding those potential jurors removed on consent. (Miller Dec. Ex. 65 at, 88, 90–92, 94, 100–02, 156–63.) Thus, it appears from the transcript that at the time of the *Batson* objection, African Americans were 52 percent of the jury pool, and challenged at a rate of 55 percent. As the respondent argues, this challenge rate is not a significant variant from the overall percentage of African–American veniremembers, and is insufficient to establish a prima facie case under *Batson. See generally Harrison v. Ricks,* 326 F.Supp.2d 372, 378–79 (E.D.N.Y.2004), *aff'd* 150 Fed.Appx. 95 (2d Cir.2005) (table); *Barbara v. Goord,* 98 Civ. 4569, 2001 WL 1776159, at *3 n. 2 (E.D.N.Y. Dec. 27, 2001) (Raggi, J.) (pursuant to *Alvarado,* "a prosecutor's percentage of minority challenges should be calculated by considering waived as well as exercised challenges."); *but see Truesdale v. Sabourin,* 427 F.Supp.2d 451, 461 (S.D.N.Y.2006) (emphasizing that 100 percent of peremptory challenges were exercised against minority veniremembers).

I also note that in *Alvarado,* the Second Circuit heard a direct appeal from a federal criminal case, and was not considering a habeas petition pursuant to Section 2254. 923 F.2d at 254. The deference required under AEDPA is not equivalent to the scrutiny of an appellate court exercising direct review. *See, e.g., Overton,* 295 F.3d at 280 n. 12 ("Our ruling in this case is governed by the deferential standard prescribed by AEDPA for *habeas* review by a federal court of a state court determination. We, therefore, do not address the question that would arise if this were a direct appeal from a federal criminal trial on the same facts and make no suggestion as to how such a case should be decided."); *see also Galarza,* 252 F.3d at 635 ("[W]hen reviewing a *Batson* challenge in the context of a habeas petition, a trial court's conclusion that a peremptory challenge was not exercised in a discriminatory manner is entitled to a presumption of correctness . . . .").

I conclude that the trial court was not unreasonable in ruling that petitioner failed to establish a prima facie case showing discriminatory exercise of peremptory strikes, and that the petition's claim for relief on *Batson* grounds is denied. The R & R is modified accordingly.

III. *The R & R Correctly Concluded that Rosario's Constitutional Rights Were Not Violated by the Testimony of the Prosecution's Rebuttal Witness*

 Rosario contends that he was denied his Fourteenth Amendment right to due process because the trial court allowed, over counsel's objection, the testimony of the prosecution's rebuttal witness, Captain Bruce Bolton, the records custodi-

---

ployed by its successor upon remand, without reference to the rejected approach. 923 F.2d

at 255.

an of the Department of Corrections in Volusia County, Florida. (Petition, Ground Three.) Bolton testified that Rosario was in Department custody from March 13, 1996, through April 12, 1996. (Trial Tr. at 451.)

First, I adopt the R & R's conclusion that Rosario exhausted this claim in the state courts. Consistent with *Davis v. Strack*, 270 F.3d 111, 122 (2d Cir.2001), Rosario alerted the Appellate Division of his contention that he was denied due process under the Fourteenth Amendment, and incorporated that contention in his submission to the New York Court of Appeals. (Appellate Division Brief at I, attached at Blira–Koessler Aff. Ex. 1; R & R at 594–96.) The Appellate Division ruled on the merits of this claim. *People v. Rosario*, 288 A.D.2d at 142–43, 733 N.Y.S.2d 405. The respondent's contention that this claim is unexhausted lacks merit.

▰ Second, I adopt the R & R's conclusion that Bolton's testimony did not violate the Fourteenth Amendment. As noted by the R & R, evidentiary rulings, even erroneous ones, rarely rise to the level of a constitutional violation. *See, e.g., Estelle v. McGuire*, 502 U.S. 62, 67–70, 112 S.Ct. 475, 116 L.Ed.2d 385 (1991). Habeas relief can be granted only if improperly admitted evidence is so unfair that it violates fundamental concepts of justice. *See, e.g., Dowling v. United States*, 493 U.S. 342, 352, 110 S.Ct. 668, 107 L.Ed.2d 708 (1990). The erroneous evidence must have provided the basis for conviction, or else the evidence must be so integral that without it, reasonable doubt would have existed. *Dunnigan v. Keane*, 137 F.3d 117, 125 (2d Cir.1998).

▰ Rosario's testimony opened the door for impeachment evidence concerning his whereabouts during March and April, 1996. He testified that he was in Florida until mid-April because he was "having a good time" and "enjoying being out there." (Trial Tr. at 384.) He stated that during this time, he "was staying in a girl's house I met over there," and resided with her from February through mid-April 1996. (Trial Tr. at 382, 394–95.) Bolton's testimony was introduced for the purpose of impeaching Rosario's factual statements. As noted in the R & R, when a defendant provides testimony as to a specific fact, the prosecutor may offer impeachment testimony showing that the defendant's testimony was untruthful. *United States v. Beno*, 324 F.2d 582, 588 (2d Cir.1963); *cert. denied*, 379 U.S. 880, 85 S.Ct. 147, 13 L.Ed.2d 86 (1964). Even if the issue is a collateral one, a witness is not permitted to benefit from "a gratuitously offered statement." *Id.*

Rosario also contends that the rebuttal evidence prompted the jury to conclude that he had a propensity toward criminal conduct, and that the resulting prejudice violated his due process rights. The trial judge, however, issued a limiting instruction directed toward Bolton's testimony:

> The defendant's incarceration in Florida is not evidence of the defendant's guilt in this case nor evidence that the defendant is the person who was disposed to commit crimes. You should consider such testimony only in determining the credibility of witnesses who have appeared before you. You should not consider his testimony for any other purpose.

(Trial Tr. at 565.) Jurors are presumed to follow instructions, *Zafiro v. United States*, 506 U.S. 534, 540, 113 S.Ct. 933, 122 L.Ed.2d 317 (1993), including limiting instructions. *United States v. Stewart*, 433 F.3d 273, 307 (2d Cir.2006). The risk of prejudice is most likely to outweigh the power of a limiting instruction in instances when impeachment testimony includes a crime similar to the one for which the

defendant is on trial. *See, e.g., United States v. Puco*, 453 F.2d 539, 542 (2d Cir. 1971). However, in this instance, the trial judge did not specify the crime for which Rosario was incarcerated, and it is unlikely that a juror would infer from the brief period of imprisonment that Rosario had been convicted of murder or a similarly serious offense.

I adopt Magistrate Judge Pitman's recommendation that Rosario's due process claim should be denied.

### IV. *The R & R Correctly Concluded that Rosario's Actual Innocence Claim Should Be Dismissed*

 Rosario asserts that his habeas petition should be granted on grounds of actual innocence. (Petition, Ground Two.) He contends that relief on grounds of actual innocence is appropriate because nine witnesses have provided exculpatory testimony placing him in Florida at or around the date of Collazo's murder, and because he was convicted on the basis of eyewitness testimony. (*Id.*)

Actual innocence may excuse a procedural default, and may arguably provide a basis not to apply the statute of limitations imposed by AEDPA. *Doe v. Menefee*, 391 F.3d 147, 161 (2d Cir.2004); *Whitley v. Senkowski*, 317 F.3d 223, 225–26 (2d Cir. 2003). Neither the Supreme Court nor the Second Circuit has recognized a free-standing claim of actual innocence as a basis for habeas relief. *See Herrera v. Collins*, 506 U.S. 390, 400, 113 S.Ct. 853, 122 L.Ed.2d 203 (1993) ("Claims of actual innocence based on newly discovered evidence have never been held to state a ground for federal habeas relief absent an independent constitutional violation occurring in the underlying state criminal proceeding."); *United States v. Quinones*, 313 F.3d 49, 67 (2d Cir.2002) (citing *Herrera* and noting that actual innocence has not been held to provide an independent basis

for habeas relief). Nevertheless, for the purpose of this petition, I will generously assume that such a basis for relief exists.

 As the R & R notes, a successful claim for actual innocence requires the petitioner to come forth with new and reliable evidence making it more likely than not that no reasonable juror presented with that evidence would have convicted the petitioner. *Schlup v. Delo*, 513 U.S. 298, 327, 115 S.Ct. 851, 130 L.Ed.2d 808 (1995). A reviewing court must evaluate the actual innocence claim in light of the entire record, including evidence that may have been inadmissible. *Id.* at 162; *Doe*, 391 F.3d at 161.

In concluding that the actual innocence assertion should be rejected, the R & R noted that, even if additional alibi testimony had been admitted, Rosario's acknowledgement that he often traveled between New York and Florida might prompt a reasonable juror to conclude that Rosario was present in New York in mid-June. (R & R at 601.) It noted that the prosecution's two eyewitnesses expressed great confidence that Rosario was the shooter, and that their testimony was unimpeached at trial. (R & R at 601.) The alibi witnesses all risked impeachment on grounds that they were friends of Rosario, the R & R noted. (R & R at 601.) I cannot conclude that no reasonable juror would have been persuaded by the prosecution's case, *see Bousley v. United States*, 523 U.S. 614, 623, 118 S.Ct. 1604, 140 L.Ed.2d 828 (1998), in what would have been, at heart, a credibility contest.

In addition, as the R & R notes, an actual innocence claim considers "whether the new evidence on which the actual innocence claim is based is reliable." *Doe*, 391 F.3d at 165. The R & R notes that, for example, witnesses at the 440.10 hearing had contradictory recollections as to Jenine Seda's whereabouts on June 19, 1996.

Such contradictions would lead to further questions about the reliability of the memories of the alibi witnesses and their placement of Rosario at a certain time and place. Given the passage of time, witness memories inevitably fade. Perhaps a jury would fully credit Rosario's alibi witnesses, or perhaps they would not. In either event, the alibi testimony is not so ironclad in its reliability that it satisfies the criteria for actual innocence.

I adopt in full Magistrate Judge Pitman's recommendation that the actual innocence claim be dismissed.

*Conclusion*

The R & R is modified to the extent that it recommends granting the petitioner relief on his *Batson* claim. It is adopted in all other respects. The petition is dismissed.

Petitioner has not made a substantial showing of the denial of a constitutional right, and, accordingly, a certificate of appealability will not issue. 28 U.S.C. § 2253.

SO ORDERED.

*REPORT AND RECOMMENDATION*

PITMAN, United States Magistrate Judge:

TO THE HONORABLE P. KEVIN CASTEL, United States District Judge,

I. *Introduction*

Petitioner Richard Rosario seeks, by his petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254, an Order vacating a judgment of conviction entered on November 23, 1998 after a jury trial in the Supreme Court of the State of New York, Bronx County (Fisch, J.), for one count of murder in the second degree in violation of New York Penal Law Section 125.25. By that judgment, petitioner was sentenced to an indeterminate term of imprisonment of twenty-five years to life and is currently incarcerated pursuant to the judgment.

Petitioner asserts four claims in his petition: (1) that petitioner was denied his Sixth Amendment right to the effective assistance of counsel, (2) that the Trial Court erred when it failed to find that petitioner had made out a *prima facie* case of discrimination under *Batson v. Kentucky*, 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986), (3) that the Trial Court deprived petitioner of his due process right to a fair trial by erroneously admitting extrinsic evidence of petitioner's prior incarceration, and (4) that petitioner is actually innocent of the crime for which he has been convicted. (Memorandum of Law in Support of Petition Under 28 U.S.C. § 2254 for Writ of Habeas Corpus ("Pet. Mem.") at 2–3).

For the reasons set forth below, I respectfully recommend that the petition be conditionally granted with respect to petitioner's *Batson* claim and denied in all other respects.

II. *Background*

A. *Facts Leading to Petitioner's Conviction*

1. *The Prosecution's Case*

Early in the afternoon on June 19, 1996 petitioner shot George Collazo in the head on Turnbull Avenue in Bronx County, New York, fatally injuring him (Trial Tr.[1] at 19). There were at least three eyewitnesses to the incident: Michael Sanchez, Collazo's friend; Robert Davis, a porter who was working in the vicinity of the shooting when it occurred; and Jose Diaz, a food vendor who was also working in the vicinity of the shooting that day (Trial Tr. at 54–56, 133–67, 286–94).

---

1. "Trial Tr." refers to the transcript of petitioner's trial.

Sanchez testified at trial that he and Collazo were walking on White Plains Road when they passed two males, one of whom Sanchez described at trial as a tall, thin Hispanic male with a fade haircut and a moustache; Sanchez described the other male as black (Trial Tr. at 139–47). Sanchez testified that after he and Collazo passed the two men, Collazo stated "why do these niggers always have to front" (Trial Tr. at 141). An argument ensued between Collazo and the Hispanic male, during which Sanchez stood approximately two feet from the Hispanic male and had an unobstructed view of the Hispanic male's face (Trial Tr. at 145, 149–50). After about a minute of arguing, Collazo and Sanchez walked away, continuing down White Plains Road and then turning on to Turnbull Avenue (Trial Tr. at 150, 190).

According to Sanchez, while he and Collazo were walking on Turnbull Avenue, the Hispanic male, with whom Collazo had just argued, approached them from behind and said something to get their attention (Trial Tr. at 153). When Sanchez turned around, the male was pointing a chrome revolver at Collazo; he then fired a single shot that hit Collazo in the head and ran away (Trial Tr. at 152–55). Sanchez ran after the shooter for a short distance, but then returned to the scene and yelled to nearby workers to call the police (Trial Tr. at 156). Sanchez testified that he had no doubt that petitioner was the shooter both when he identified petitioner in a lineup almost three weeks after the shooting and when he identified petitioner at trial (Trial Tr. at 165).

On the day of the murder, Robert Davis, a porter, was working on Turnbull Avenue when he heard someone say, "You won't do this anymore" (Trial Tr. at 53–56). Davis then saw three men walking towards him when one shot another in the head and ran (Trial Tr. at 56–57). Davis testified that he was able to see the faces of the three men, none of whom he had ever seen before and who were approximately two car lengths away from him at the time. Although it had started to drizzle, Davis had an unobstructed view of the incident (Trial Tr. at 58).

Davis reviewed "mug books" at the police precinct on the day of the shooting, but could not then identify the shooter (Trial Tr. at 80). Later that day detectives went to Davis' place of work with additional photographs. Davis believes he looked at 50 to 75 more photos before he identified petitioner's (Trial Tr. at 86). Davis testified that the officers and detectives who presented the photographs to him did not tell him that he had to select a photograph, and the photograph he selected was not marked (Trial Tr. at 85–86). Davis also testified that after he selected petitioner's photograph, he never saw the photo again (Trial Tr. at 88). Davis testified that when he recognized petitioner in a lineup on July 9 and in court, he had no doubt that petitioner was the shooter (Trial Tr. at 66).

Jose Diaz, a food vendor operating a hot dog truck on the day of the shooting, witnessed the argument between Collazo and the other two males, which he believed lasted about ten minutes; Diaz witnessed the argument from approximately twenty-eight feet away (Trial Tr. at 292–93). Diaz testified that after the argument, the males walked in separate directions, but one of the males with dark skin ran down the street. Diaz did not see the shooting, but heard the shot (Trial Tr. at 295). Diaz testified that he might be able to recognize the men he saw arguing that day, but did not identify petitioner in the courtroom (Trial Tr. at 295).

Detective Martinez of the 43rd precinct testified that he interviewed both Sanchez and Davis the day of the shooting, and that while the men were in the precinct they

were separated from each other so that they could not discuss the incident (Trial Tr. at 116). Detective Martinez also testified that when Diaz and Sanchez viewed a lineup on July 9 that included the petitioner, they were not permitted to speak to each other and were kept in separate rooms before viewing the lineup (Trial Tr. at 110).

### 2. Petitioner's Defense

Petitioner presented an alibi defense. Specifically, petitioner contended that on the day of the shooting he was in Deltona, Florida, where he had been residing since approximately May 26, 1996, and that he did not leave Florida until June 29 after he heard from his family in New York that the police were looking for him.

Petitioner presented two alibi witnesses at trial, Jenine Seda and John Torres, who traveled from Florida to testify that petitioner was living with them, and that they both saw him on the day of the murder, June 19.

Seda testified that she had known petitioner since December of 1995, and that petitioner was staying at her house in Deltona from approximately the end of April or beginning of May, 1996 until about June 30 (Trial Tr. at 307–08, 323). Seda testified that while petitioner was living with her and her boyfriend, John Torres, petitioner and John[2], who were good friends, spent most of their time together because neither of them were working (Trial Tr. at 311). Seda testified that she knew petitioner was at her house on June 19 (Trial Tr. at 312), and that she remembers that day because it was the day before her son was born (Trial Tr. at 335). Seda also stated that she was admitted to the hospital at about 5:00 a.m. on June 20 and that petitioner was at her home when she returned from the hospital on June 21 (Trial

Tr. at 328). Seda testified that while traveling from Florida to New York for the trial, she and John Torres did not discuss either their memories regarding June 19 or the fact that they were testifying (Trial Tr. at 324–25).

John Torres testified that petitioner was living with him from about April until June 19, 1996, when petitioner went to live with John's brother, Robert Torres, to make room for John and Seda's new baby (Trial Tr. at 344, 360–61). John testified that on June 19 his car broke down and he spent the day with petitioner looking for car parts before returning to John's home (Trial Tr. at 347). John had no receipts or other documents to corroborate that his car had broken down or that parts were purchased that day (Trial Tr. at 349). John testified further that Seda was working on June 19. John also stated that in June, 1996 he was working at a toll plaza five days a week (Trial Tr. at 349). John testified that while he and Seda were traveling to New York for the trial they discussed the fact that they would be testifying and what might happen (Trial Tr. at 351).

Petitioner also offered the testimony of the New York terminal manager for Greyhound Busline and introduced as evidence a "readout of a transaction" for the sale of a bus ticket. The "readout" indicated that Richard Rosario had purchased tickets to travel from Orlando, Florida to New York on June 30, 1996 (Trial Tr. at 366–69). The manager testified that while the "readout" gives the name of the passenger, date of purchase, and destinations, Greyhound does not routinely require a passenger to submit identification upon paying or boarding (Trial Tr. at 371–72).

---

**2.** Because this report and recommendation repeatedly refers to witnesses with the same surname, I refer to individuals with non-unique surnames by their first name.

Petitioner testified in his own defense regarding three different time periods when he was in Deltona, Florida. The first was a two-week visit in late December, 1995 until early January of 1996, during which he met John Torres and Jenine Seda (Trial Tr. at 377–80). The second was a visit from February through mid-April, 1996 (Trial Tr. at 386–87). The third was from late May, 1996 until June 30, 1996. During the second and third trips, petitioner had hoped to find work, re-locate to Florida, and have his fiancé, Minerva Godoy, and their children join him in Florida (Trial Tr. 399–400). Petitioner stated that both he and his friend John Torres were not working in June 1996 and that during his trip in May and June, Ms. Godoy wired money to him via Western Union on at least three occasions (Trial Tr. 422–24). Because petitioner did not have a valid, government-issued identification that was required to receive a money wire transfer, Ms. Godoy transmitted the money to John to give to petitioner (Trial Tr. at 423). Petitioner testified that he lived at John and Seda's home from the end of May until after the baby was born on June 20, when he left to stay with his friend Ray so that John and Jenine could have more privacy and space (Trial Tr. at 409–10). Petitioner recalled that he was with John Torres when John's car broke down and they went looking for parts; however, petitioner could not recall whether this occurred on June 19 or a different day before the baby was born (Trial Tr. at 419). On June 30, petitioner left Florida and returned to New York after his sister told him that detectives were looking for him in connection with a murder (Trial Tr. at 388–89).

During Cross-examination, the prosecutor questioned petitioner about his February to April, 1996 visit to Florida. Petitioner testified that he stayed at the home of a friend, Shannon Beane, until he left for New York on April 13 (Trial Tr. at 394–95).

### 3. The Prosecution's Rebuttal Case

The prosecution presented as a rebuttal witness Captain Bruce Bolton of Volusia County, Florida, Department of Correction. Captain Bolton testified that he was the records custodian of the Volusia County Department of Corrections in Daytona, Florida and that the Department's records showed that petitioner was in custody in Volusia County from March 13, 1996 until April 12, 1996.

Before Captain Bolton testified, petitioner's attorney, Steven Kaiser, objected to the rebuttal evidence on the grounds that: (1) petitioner was never directly questioned about whether he was incarcerated during the period of time at issue and given the opportunity to address the issue before the improper introduction of extrinsic evidence on a collateral matter and (2) the introduction of this "bad act" evidence would result in unjust prejudice against petitioner and that petitioner had never been given the opportunity of seeking a *Sandoval*[3] hearing outside the presence of the jury concerning this period of incarceration (Trial Tr. at 435–37). The Court allowed the testimony, accepting the prosecution's argument that the captain's testimony was part of disproving petitioner's alibi defense that he was living with the other witnesses in Florida (Trial Tr. at 439).

### 4. Summations

Defense counsel's summation focused on inconsistencies between the descriptions of the shooter that the eyewitnesses gave to detectives and in court, such as differences regarding the shooter's approximate

---

**3.** *People v. Sandoval*, 34 N.Y.2d 371, 357 N.Y.S.2d 849, 314 N.E.2d 413 (1974).

height, facial characteristics, and clothing. Defense counsel also stressed the unreliability of eyewitness identifications (Trial Tr. at 488–503). Counsel pointed out that if petitioner's alibi witnesses, John and Seda, were conspiring to give false testimony on petitioner's behalf, then their testimonies would be more, not less, consistent with each other (Trial Tr. at 474). Defense counsel suggested to the jury that petitioner was not dishonest when he testified that he stayed with a friend during a time period that included his four weeks in the county jail, as it is consistent for a person to say they live in one place even if they are temporarily incarcerated elsewhere during that time (Trial Tr. at 485).

During its summation, the prosecution focused on the credibility of the eyewitnesses, Sanchez and Davis, while minimizing the inconsistencies in the descriptions they gave to detectives after the shooting (Trial Tr. at 520–21). With regard to petitioner's witnesses, the prosecutor explained to the jury "that the little things about the testimony [are] what you have to look at to determine if you can rely on the witnesses" (Trial Tr. at 528–29). The prosecution then suggested that Jenine Seda and John Torres "are interested witnesses, interested because they have an interest in the outcome of the case. They don't want to see their friend go to jail" (Trial Tr. at 529). Because John and Seda were inconsistent on "little things," such as whether John was working on and around June 19, 1996, the prosecution suggested that John and Seda were unreliable witnesses (Trial Tr. at 530). The prosecution argued that John and Seda's inconsistent testimony about whether they discussed the trial while traveling to New York also demonstrated their unreliability (Trial Tr. at 532). The prosecution pointed out that John and Seda both testified inaccurately that defendant lived with them from early April through June (Trial Tr. at 531). Moreover, the prosecution noted that the Greyhound ticket evidence offered by the defense does not really establish anything since Greyhound does not check the identification of its passengers (Trial Tr. at 533).

With respect to petitioner's testimony that he lived with Shannon Bean while he was actually incarcerated, the prosecution suggested that petitioner's responses were untruthful because he did not want the jury to know that he was in jail. According to the prosecution, this showed that petitioner was willing to lie on the stand and mislead the jury (Trial Tr. at 536).

#### 5. Jury Instructions

The Trial Judge informed the jury that an interested witness is one who, "by reason of relationship [or] friendship" with either a party or a witness, might give biased testimony in favor of that person and that an interested witness' testimony may be accepted despite, or rejected in light of, that witness' interest in the outcome of the case (Trial Tr. at 558–559).

The Trial Judge also gave a limiting instruction regarding the evidence concerning petitioner's incarceration in Florida in March and April of 1996. The judge told the jury that the evidence of the incarceration could not be considered as evidence of petitioner's propensity to commit crimes. He did, however, advise the jury that it could be considered "in determining the credibility of witnesses who have appeared before you" (Trial Tr. at 565).

### B. Procedural History

#### 1. Petitioner's Direct Appeal

Petitioner appealed his conviction to the Appellate Division of the New York State Supreme Court, First Department, arguing: (1) the prosecutor's introduction of extrinsic evidence that petitioner was incarcerated during a period that ended over two months before the June 19 shooting

deprived petitioner of his Fourteenth Amendment Due Process right to a fair trial (Brief for Defendant–Appellant ("App. Div. Br.") at 32–46, annexed as Exhibit 1 to Affidavit in Opposition to Habeas Corpus Petition ("Resp. Op.") (Docket Item 12)); (2) the prosecutor's use of all six peremptory challenges to strike prospective African–American jurors established a *prima facie* case of discrimination under *Batson,* requiring the prosecution to offer race-neutral reasons for its challenges (App. Div. Br. at 46–53); and (3) the cumulative impact of the prosecutor's improper tactics misled and unfairly influenced the jury in violation of petitioner's Fourteenth Amendment Due Process right to a fair trial (App. Div. Br. at 53–63).

The Appellate Division unanimously affirmed petitioner's conviction on November 27, 2001. The Appellate Division held that (1) the Trial Court properly exercised its discretion in allowing the prosecution to introduce rebuttal evidence that petitioner was incarcerated, as it tended to disprove his alibi, was not collateral because petitioner made his multiple trips to Florida "integral parts of his alibi defense," and had minimal prejudicial effect particularly in light of the Trial Court's limiting instruction; (2) petitioner had failed to establish a *prima facie* case of racial discrimination by the prosecutor's use of peremptory challenges because the mere number of the prosecution's peremptory challenges against African–American prospective jurors did not establish a *prima facie* case, and petitioner failed to show disparate treatment or other relevant circumstances raising an inference of discriminatory purpose; and (3) petitioner's challenges to the prosecutor's questioning of witnesses and comments in summation were not preserved, and, in any event, did not present a basis for reversal. *People v. Rosario,* 288 A.D.2d 142, 142–143, 733 N.Y.S.2d 405, 406–407 (1st Dep't 2001).

The New York State Court of Appeals denied petitioner's leave to appeal on March 26, 2002. *People v. Rosario,* 97 N.Y.2d 760, 769 N.E.2d 367, 742 N.Y.S.2d 621 (2002).

### 2. *Petitioner's Motion to Vacate*

On June 11, 2003, petitioner filed a motion pursuant to New York Criminal Procedure Law Section 440.10 to vacate the judgment of conviction, arguing that he had been denied effective assistance of counsel. The Honorable Edward M. Davidowitz, Justice of New York State Supreme Court, Bronx County held an evidentiary hearing at which petitioner presented seven of his purported alibi witnesses, two of his defense attorneys (Joyce Hartsfield and Steven J. Kaiser) and Hartsfield's investigator on the case, Jessie Franklin. In a twenty-two page opinion, Justice Davidowitz denied relief, finding that both Hartsfield and Kaiser provided petitioner with "meaningful representation" (Decision and Order of the Honorable Edward M. Davidowitz, Justice of the Supreme Court, dated April 4, 2005 ("440 Order"), annexed as Exhibit 17 to Resp. Op., at 18).

The Appellate Division denied leave to appeal Justice Davidowitz's decision on September 8, 2005 (Certificate Denying Leave, annexed as Exhibit 19 to Resp. Op.).

Petitioner filed his petition for a writ of habeas corpus on September 16, 2005.

### C. *The Current Petition*

As noted above, petitioner asserts four claims: (1) that petitioner was denied his Sixth Amendment right to effective assistance of counsel based on his attorneys' failure to adequately investigate and to present additional witnesses and documentary evidence in support of his alibi defense; (2) that the Trial Court erred when

it refused to find a *prima facie* case of discrimination under *Batson v. Kentucky, supra,* 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 and when it refused to require the prosecution to give race-neutral grounds for using all of its peremptory challenges to strike African–American prospective jurors; (3) that the Trial Court deprived petitioner of his Due Process right to a fair trial by erroneously admitting extrinsic evidence that petitioner had been in jail three months before the murder; and (4) that petitioner is actually innocent of the crime of which he was convicted (Pet. Mem. at 2–3).

III. *Analysis*

A. Standard of Review

Where the state court has decided a habeas petitioner's claims on the merit s, a habeas petitioner must meet a stringent standard before a federal court can issue the writ. Specifically, 28 U.S.C. § 2254(d), modified by the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), provides that in such a situation, habeas relief may be granted only when the Trial Court's decision

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

The Supreme Court has explained the alternative standards contained in the former paragraph as follows:

> First, we have explained that a decision by a state court is "contrary to" our clearly established law if it "applies a rule that contradicts the governing law set forth in our cases" or if it "confronts a set of facts that are materially indistinguishable from a decision of this Court

and nevertheless arrives at a result different from our precedent." *Williams v. Taylor,* 529 U.S. 362, 405–406, 120 S.Ct. 1495, 146 L.Ed.2d 389 (2000). See also *Early v. Packer,* 537 U.S. 3, 7–8, 123 S.Ct. 362, 154 L.Ed.2d 263 (2002) (*per curiam* ). . . .

Second, [petitioner] can satisfy § 2254(d) if he can demonstrate that the [State] Court's decision involved an "unreasonable application" of clearly established law. As we have explained:

> "[A] federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the state-court decision applied [a Supreme Court case] incorrectly. See *Bell v. Cone,* 535 U.S. 685, 698–699, 122 S.Ct. 1843, 152 L.Ed.2d 914 (2002); *Williams, supra,* at 411, 529 U.S. 362, 120 S.Ct. 1495, 146 L.Ed.2d 389. Rather, it is the habeas applicant's burden to show that the state court applied [that case] to the facts of his case in an objectively unreasonable manner."

*Woodford v. Visciotti,* 537 U.S. 19, 24–25, 123 S.Ct. 357, 154 L.Ed.2d 279 (2002) (*per curiam* ).

*Price v. Vincent,* 538 U.S. 634, 640–41, 123 S.Ct. 1848, 155 L.Ed.2d 877 (2003); *accord Brown v. Payton,* 544 U.S. 133, 139–40, 125 S.Ct. 1432, 161 L.Ed.2d 334 (2005); *see also Lockyer v. Andrade,* 538 U.S. 63, 70–72, 123 S.Ct. 1166, 155 L.Ed.2d 144 (2003); *Hawkins v. Costello,* 460 F.3d 238, 242–43 (2d Cir.2006); *Brown v. Artuz,* 283 F.3d 492, 500–01 (2d Cir.2002).

In addition to the definition of "unreasonable application" set forth above, a state court may unreasonably apply Supreme Court precedent "if the state court unreasonably extends a legal rule established by the Supreme Court or if it unreasonably fails to extend a legal rule to a context in which the rule reasonably

should apply." *Serrano v. Fischer,* 412 F.3d 292, 296–97 (2d Cir.2005), *cert. denied,* 546 U.S. 1182, 126 S.Ct. 1357, 164 L.Ed.2d 68 (2006).

"Unreasonableness is determined by an 'objective' standard." *Gersten v. Senkowski,* 426 F.3d 588, 607 (2d Cir.2005), *cert. denied,* 547 U.S. 1191, 126 S.Ct. 2882, 165 L.Ed.2d 894 (2006), *quoting Williams v. Taylor,* 529 U.S. 362, 409, 120 S.Ct. 1495, 146 L.Ed.2d 389 (2000). In order for a state court's application of Supreme Court precedent to be unreasonable, "[s]ome increment of incorrectness beyond error" is required. *Henry v. Poole,* 409 F.3d 48, 68 (2d Cir.2005), *cert. denied,* 547 U.S. 1040, 126 S.Ct. 1622, 164 L.Ed.2d 334 (2006) (internal quotation marks omitted); *accord Brown v. Artuz, supra,* 283 F.3d at 500–01; *Aparicio v. Artuz, supra,* 269 F.3d at 94. However, "the increment need not be great; otherwise, habeas relief would be limited to state court decisions 'so far off the mark as to suggest judicial incompetence.'" *Francis S. v. Stone,* 221 F.3d 100, 111 (2d Cir.2000), *quoting Matteo v. Superintendent, SCI Albion,* 171 F.3d 877, 889 (3rd Cir.1999) (*en banc*); *accord Gersten v. Senkowski, supra,* 426 F.3d at 607.

The nature of the rule in issue also impacts the assessment of the reasonableness of the state court's action.

> [W]hile very specific rules may not permit much leeway in their interpretation, the same is not true of more general rules, the meaning of which "must emerge in application over the course of time." [*Yarborough v. Alvarado,* 541 U.S. 652, 664, 124 S.Ct. 2140, 158 L.Ed.2d 938 (2004)]. "The more general the rule, the more leeway courts have in reaching outcomes in case by case determinations." *Id.*

*Serrano v. Fischer, supra,* 412 F.3d at 297; *see also Hawkins v. Costello, supra,* 460 F.3d at 243.

Both the "contrary to" and "unreasonable application" clauses "restrict[] the source of clearly established law to [the Supreme] Court's jurisprudence." *Williams v. Taylor, supra,* 529 U.S. at 412, 120 S.Ct. 1495. "That federal law, as defined by the Supreme Court, may either be a generalized standard enunciated in the [Supreme] Court's case law or a bright-line rule designed to effectuate such a standard in a particular context." *Kennaugh v. Miller,* 289 F.3d 36, 42 (2d Cir.2002). "A petitioner can not win habeas relief solely by demonstrating that the state court unreasonably applied Second Circuit precedent." *Yung v. Walker,* 341 F.3d 104, 110 (2d Cir.2003); *accord DelValle v. Armstrong,* 306 F.3d 1197, 1200 (2d Cir.2002).

In order to be entitled to the deferential standard of review under subsection 2254(d), the state courts must have resolved the petitioner's claims "on the merits." *Cotto v. Herbert,* 331 F.3d 217, 230 (2d Cir.2003); *see e.g. Ryan v. Miller,* 303 F.3d 231, 245 (2d Cir.2002) ("[I]n order for this deferential standard of § 2254 to apply, we must first determine that the state court considered [petitioner's claim] on its merit s"); *Sellan v. Kuhlman,* 261 F.3d 303, 309–10 (2d Cir.2001).

For habeas purposes, a state court is deemed to have reached the merit s of a federal claim when the state court's decision "fairly appear[s] to rest primarily on federal law or to be interwoven with federal law," unless there is a "clear and express statement of reliance on a state procedural bar." *Jimenez v. Walker,* 458 F.3d 130, 145 (2d Cir.2006); *see Coleman v. Thompson, supra,* 501 U.S. 722, 739–40, 111 S.Ct. 2546, 115 L.Ed.2d 640 (1991). Habeas courts in this circuit examine "the face of the state-court opinion, ... whether the state court was aware of a procedural bar, and ... the practice of state courts in similar circumstances" to deter-

mine whether a state court decision falls into one of the above classifications. *Jimenez v. Walker, supra,* 458 F.3d at 145 n. 16.

I shall address the nature of the state court's disposition of each of petitioner's claims in connection with my discussion of each of the claims.

### B. *Petitioner's Claims*

### 1. *Ineffective Assistance of Counsel*

Petitioner claims that he did not receive effective assistance of counsel based on counsel's failure to investigate petitioner's alibi defense adequately and to produce additional witnesses and documentary evidence that would have supported petitioner's alibi (Pet. Mem. at 18).

Petitioner was represented by at least four defense attorneys after his arrest. The representation provided by petitioner's first two attorneys, one of whom represented petitioner at arraignment, the other at petitioner's lineup, is not at issue. Petitioner's third attorney, Joyce Hartsfield, represented petitioner from about mid-July, 1996 until mid-February of 1998 (Hrg. Tr.[4] at 14). Steven J. Kaiser represented petitioner after Hartsfield and through his trial (Hrg. Tr. at 117). Petitioner claims that Hartsfield and Kaiser's representation was ineffective.

Petitioner asserts that he had always maintained that he was in Florida on the date of the murder. Immediately after turning himself in, petitioner wrote a statement for the police describing various events in Florida, providing the names of at least eleven potential alibi witnesses and identifying potential documentary evidence that he believed would establish his presence in Florida at the time of the murder (Pet. Mem. at 18; Petitioner's

Post–Arrest Statement ("Post–Arrest Stmnt."), annexed as Exhibit 10 to the Declaration of Jodi K. Miller ("Miller Decl.")). In his statement, petitioner claimed that he went to Florida on a Greyhound bus around the end of May and did not leave Florida until June 29, 1996. Petitioner claimed that several individuals in Florida could attest to his presence there, including John Torres' mother, Margarita Torres, and his father, Fernando Torres, as well as John Torres, Jenine Seda, Robert Torres, David Guzman, Nerida Colon, "Ray MH," "Mike," "Gordo," and "Hector."[5] Petitioner had addresses for most of these individuals but not telephone numbers. Petitioner also reported in his post-arrest statement that during June, he and Gordo went to a bail bondsman to bail out their friend Michael. Petitioner also noted in his post-arrest statement that he had been incarcerated during a previous trip to Florida, but that he had been released from jail on April 12, 1996 (Post–Arrest Stmnt.).

While Hartsfield was representing petitioner, she moved for funds to investigate petitioner's alibi defense in Florida, and the Trial Court granted that motion during a hearing in the presence of Hartsfield and petitioner (Calendar Call Transcript, dated March 19, 1997, annexed as Exhibit 29 to Miller Decl.). Nevertheless, for unknown reasons, many of those alibi witnesses were never contacted by detectives, prosecutors, investigators, or petitioner's attorneys until petitioner's appellate counsel found them in Florida after petitioner was convicted of Collazo's murder.

### a. *Petitioner's 440 Hearing*

Because petitioner's claim of ineffective assistance raised factual issues that were

---

**4.** "Hrg. Tr." refers to the transcript of the hearing held in connection with petitioner's 440.10 motion.

**5.** The record does not reveal the full names of "Ray MH," "Mike," "Gordo," or "Hector."

outside the record of his trial, he properly asserted and exhausted the claim by way of a motion to vacate pursuant to New York Criminal Procedure Law Section 440.10. *Arce v. Smith,* 889 F.2d 1271, 1272 (2d Cir.1989) (ineffective assistance claim normally raised by collateral proceeding since its resolution "often requires evidence not contained in the record"); *Washington v. Greiger,* 00 Civ. 2383(RWS), 2001 WL 214236 at *3 (S.D.N.Y. Mar. 1, 2001) (same); *Otero v. Stinson,* 51 F.Supp.2d 415, 418–419 (S.D.N.Y.1999) (same); *Garcia v. Scully,* 907 F.Supp. 700, 706 (S.D.N.Y.1995) (same); *People v. Brown,* 45 N.Y.2d 852, 382 N.E.2d 1149, 410 N.Y.S.2d 287 (1978). Pursuant to petitioner's motion, the Trial Court conducted an evidentiary hearing at which evidence was offered establishing the following facts.

Hartsfield testified that she made no efforts to obtain any documentary evidence in support of petitioner's alibi (Hrg. Tr. at 32). Though Hartsfield was aware that petitioner claimed he bailed a friend out of jail in Florida in June of 1996, she did not make any efforts to contact the bail bondsman identified by petitioner (Hrg. Tr. at 27–28). Hartsfield also admitted that although petitioner had told her that his fiancé had wired money to him in Florida in June of 1996, Hartsfield did not contact Western Union to obtain records of those transactions (Hrg. Tr. at 28).[6] Petitioner also told Hartsfield that his fiancé had called petitioner in Florida at a public pay phone, yet Hartsfield made no effort to obtain toll records of those calls (Hrg. Tr. at 30). Petitioner's counsel questioned Hartsfield about a police "field contact report" that noted that petitioner had been stopped by the police in Deltona, Florida on May 30, 1996, but Hartsfield could not recall whether petitioner had told her about that event (Hrg. Tr. at 30–31).

Petitioner had told Hartsfield that he knew several people who could corroborate that he was in Florida on the day of the murder (Hrg. Tr. at 14). In response to this information, Hartsfield hired an investigator, Jessie Franklin, to assist her in finding and interviewing petitioner's potential alibi witnesses (Hrg. Tr. at 43). Hartsfield and Franklin initially decided that they would focus their investigation on the couple with whom petitioner had lived during June, 1996, John Torres and Jenine Seda, because it appeared they were in the best position to confirm petitioner's presence in Florida on the day of the murder, June 19 (Hrg. Tr. at 88). Hartsfield did not know whether other witnesses could also provide an alibi for June 19 (Hrg. Tr. at 107). On October 25, 1996, Franklin spoke by telephone with John Torres's father, Fernando Torres, and his brother, Robert Torres, but was unable to locate John Torres at that time (Jessie Franklin Activity Log, annexed as Exhibit 17 to Miller Decl.).

On October 29, 1996, after Franklin was unsuccessful in her attempts to contact John Torres, Jenine Seda, and several other potential witnesses, Hartsfield filed an omnibus motion on behalf of petitioner requesting, *inter alia,* court authorization to send an investigator to Florida to find credible alibi witnesses (Hrg. Tr. at 43). The motion was accompanied by an affidavit signed by Franklin, stating that she had only been able to speak with two potential alibi witnesses, that her attempts

---

**6.** Petitioner's post-conviction counsel attempted to obtain these records from Western Union in June, 2004, but Western Union responded that it only maintained these records for 60 months, i.e. until June, 2001 (June 17, 2004 letter from Stacy C. Anderson of Western Union to Morrison & Foerster, LLP in response to subpoena, annexed as Exhibit 53 to Miller Decl.).

to contact other witnesses who had moved or who did not have access to a telephone had been unsuccessful, and that she needed to travel to Florida to conduct an effective investigation concerning petitioner's defense (Affidavit of Jessie Franklin, sworn to Oct. 29, 1996 ("Franklin Af.") attached to Notice of Omnibus Motion, annexed as Exhibit 25 to Miller Decl.). During a hearing on March 19, 1997, the Honorable Joseph Fisch, Justice of New York State Supreme Court, Bronx County, granted Hartsfield's request to send Franklin to Florida (Hrg. Tr. at 48). Hartsfield, however, did not recall whether the request had been granted until she reviewed the transcript of the March 19, 1997 proceeding in preparation for the 440.10 hearing (Hrg. Tr. at 50).

On September 22, 1997, several months after Justice Fisch granted Hartsfield's request to send an investigator to Florida, Franklin finally located and interviewed John Torres and Jenine Seda in Pennsylvania, where the two were then residing (Hrg. Tr. at 91).

Hartsfield never sent Franklin to Florida and was unable to explain why, although she believed there could have been logistical reasons (Hrg. Tr. at 50). Hartsfield also testified that if she had realized the motion had been granted, then she would have sent Franklin to Florida, suggesting that she had been unaware of the outcome of her omnibus motion in 1997 (Hrg. Tr. at 51). She testified that she did not make a conscious strategic decision to limit potential alibi witnesses to Jenine Seda and John Torres (Hrg. Tr. at 73). Rather, Hartsfield acknowledged the success of an alibi defense turned on the credibility of the witnesses and that an incredible alibi witness could jeopardize the defense (Hrg. Tr. at 95).

Kaiser represented petitioner from February 18, 1998 through pre-trial hearings and his trial (Hrg. Tr. at 117). Immedi-

ately before petitioner's 440.10 hearing, Kaiser submitted an affirmation, in which he stated that when he took petitioner's defense, Hartsfield had told him that the Court "had specifically denied her request to send the assigned investigator to Florida to follow-up on initial alibi evidence already adduced" (Affirmation of Steven Kaiser, dated Dec. 31, 2003, annexed as Exhibit 50 to Miller Decl. ("Dec. 31, 2003 Kaiser Affirm.")). Hartsfield's then submitted an affirmation, stating that after she reviewed the transcript of the March 19, 1997 hearing before Justice Fisch, she recalled that the justice had granted expenses for a Florida investigation; she did not recall telling Kaiser that the judge had denied the expenses (Affirmation of Joyce Hartsfield, dated Jan. 29, 2004, annexed as Exhibit 51 to Miller Decl.). On February 7, 2004 Kaiser submitted another affirmation, stating that on January 30, 2004 he received and read Hartsfield's affirmation and the minutes of the March 19, 1997 hearing before Justice Fisch, and Kaiser retracted his prior statement that Hartsfield had told him her request to send an investigator to Florida had been denied (Affirmation of Steven Kaiser, dated Feb. 7, 2004, annexed as Exhibit 52 to Miller Decl. ("Feb. 7, 2004 Kaiser Affirm.")). Kaiser asserted in this second affirmation that he did the best he could under the mistaken belief that the request for investigative expenses had been denied, that he used mail and telephone to try to establish contact with witnesses in Florida, and that he made arrangements for the known alibi witnesses to be able to travel to New York to testify (Feb. 7, 2004 Kaiser Affirm.).

Kaiser testified that he is not certain who he spoke with in Florida other than John Torres and Jenine Seda, but he believed he spoke to John's father, Fernando Torres, his wife, Margarita Torres, and "contemporaries of Torres and Seda" (Hrg. Tr. at 124–25). These individuals

told Kaiser that they could not afford to travel to New York. Kaiser suspected that lack of finances was being used as an excuse by people "not as eager to help Mr. Rosario when [Kaiser] was dealing with them as they might have been when Mr. Barry, the investigator for Legal Aid Society was with them in their home ... not necessarily because they weren't going to be truthful. But just that they weren't that thrilled about the prospect of having to leave whatever they were doing and come up and it was more than just the money" (Hrg. Tr. at 194–95). Because Kaiser believed the court had denied funding to send an investigator to Florida, he testified that he also believed funding for witnesses to travel to New York would likewise be denied. Kaiser did not, therefore, request such funds or advise any potential witnesses that such costs could be reimbursed (Hrg. Tr. at 128).

Kaiser testified that while preparing petitioner's trial, he (Kaiser) believed John Torres and Jenine Seda were the best witnesses because they could establish the date of petitioner's presence in Florida by virtue of their son's birth on June 20 and because they had no prior convictions that the prosecution might use to impeach them (Hrg. Tr. at 196, 221, 225). Kaiser believed that other potential witnesses with whom he spoke would have only provided similar testimony and were not as cooperative (Hrg. Tr. at 195). Kaiser also admitted, however, that he would have preferred to have had more alibi witnesses, especially ones who did not live with petitioner (Hrg. Tr. at 196–99).

Jessie Franklin testified that she was hired by Hartsfield to investigate petitioner's alibi defense. According to Franklin's notes, she met with petitioner on September 23, 1996 at Rikers Island, and petitioner gave Franklin addresses for John Torres, Robert Torres and his wife Chenoa, Ricardo Ruiz, and Nerida Colon. He also gave Franklin a telephone number where he believed another potential witness, Denise Hernandez, could be reached (Jessie Franklin's notes, dated Sept. 23, 1996, annexed as Exhibit 19 to Miller Decl.).

Franklin also testified that prior to drafting an affidavit in support of the motion for funding to investigate in Florida, she was only able to reach two of petitioner's potential alibi witnesses, Fernando and Robert Torres, with whom she spoke for a total of approximately one hour (Hrg. Tr. at 384–85, 403–04). Franklin's notes indicate that on October 25, 1996, Fernando told her that "in the latter part of June" he, his son John and petitioner had looked for car parts and that petitioner had contributed thirty dollars toward the purchase of the parts because he had been using the car and was going to New York (Hrg. Tr. at 391–92, 438). Franklin testified that, according to her notes, Fernando did not specifically tell her that he saw petitioner on June 19, and she had not asked Fernando about his arrest history as she normally would have if a potential witness were cooperative (Hrg. Tr. at 437–38). Franklin's October 25 notes also indicate that Robert Torres had reported to her that petitioner left John's home after the baby was born on June 20 and then stayed with David Guzman (Jessie Franklin's notes, dated Oct. 25, 1996, annexed as Exhibit 21 to Miller Decl.). Franklin did not contact Fernando or Robert again and assumed the request for funding for her to investigate in Florida had been denied because she never heard otherwise from Hartsfield (Hrg. Tr. at 404, 407).

Franklin re-opened her investigation into petitioner's case in September, 1997 and interviewed Jenine Seda and John Torres (Hrg. Tr. at 411). John Torres informed Franklin that he could provide a list of names of other alibi witnesses in Florida (Hrg. Tr. at 413). Franklin also

attempted at that time to contact a number of other individuals named by petitioner, but was unsuccessful (Hrg. Tr. at 416–17). When Franklin spoke with Seda and John Torres, she did not make any determinations as to whether they would be the best witnesses for petitioner. Rather, John and Seda were the ones Franklin could contact at that time, and Franklin still considered it necessary to investigate petitioner's alibi further (Hrg. Tr. at 418–20, 433). After Kaiser took petitioner's case, Kaiser never contacted Franklin to discuss witnesses or to follow up on what she learned in her investigation (Hrg. Tr. at 422).

Fernando Torres testified he remembered spending June 19 with petitioner and his son, John Torres, after John's car broke down and the three of them looked for car parts. Fernando did not know until several years later that the crime for which petitioner was arrested had occurred on June 19 (Hrg. Tr. at 318, 364, 372, 374).[7] Fernando's written statement, which was also submitted as evidence in support of the motion to vacate, asserts that he knew petitioner was in Florida on June 19 because he saw petitioner in John's apartment; the statement does not mention that Fernando spent time that day with petitioner looking for car parts (Statement of Fernando Torres, signed Nov. 9, 2002, annexed as Exhibit 56 to Miller Decl.). Fernando could not recall being contacted by a lawyer or an investigator regarding petitioner until 2004, although he testified that Jessie Franklin's name sounded familiar to him (Hrg. Tr. at 329, 332–33). Fernando testified that petitioner's sisters had to pay for John and Seda to travel to New York to testify, and that the sisters had told him petitioner's attorney suggested John's testimony would be sufficient (Hrg. Tr. at 332–33). Fernando testified that he would have come to New York to testify at petitioner's trial if he had been asked to and been provided with money to cover travel expenses (Hrg. Tr. at 333–34).

Ricardo Ruiz testified that he saw petitioner about five times a week during the month of June, 1996, and that he saw petitioner several days after John Torres' baby was born (Hrg. Tr. at 463, 488). Ricardo could not recall whether or not he saw petitioner on June 19 (Hrg. Tr. at 476), but he believed petitioner had been in Florida since the winter of 1995–96 except for a brief period after his release from jail in April (Hrg. Tr. at 479).

Chenoa Ruiz lived next door to John Torres and Jenine Seda while petitioner was staying with them in June, 1996 (Hrg. Tr. at 497). Chenoa testified that she did not like petitioner because John was "hanging out" with petitioner instead of properly attending to Seda during her pregnancy (Hrg. Tr. at 503). Chenoa testified that on the night of June 18, 1996, when she took Seda to the hospital, she saw petitioner with John and some of their friends at John and Seda's home (Hrg. Tr. at 500, 547). Chenoa also testified that she saw petitioner at John and Seda's home on June 19, both at about 11:30 a.m. when she picked up Seda for a doctor's appointment, and gain several hours later when she brought Seda back (Hrg. Tr. at 548, 550). Petitioner's presence at John and Seda's home on these days stuck in Chenoa's mind because, in her words, petitioner was like a "spotlight" and caused

7. During Fernando's cross-examination at the 440 hearing, respondent's counsel reported that Fernando had informed petitioner's counsel, Jodi Miller, that he, petitioner and John looked for car parts three or four days before John's baby was born. Petitioner's counsel agreed to submit a stipulation regarding this, but no such stipulation has been included in petitioner's habeas submissions (Hrg. Tr. at 344).

problems for her and Seda by staying out late with their boyfriends (Hrg. Tr. at 527). Chenoa could not recall whether petitioner went to New York after he got out of jail in April, 1996. Chenoa also did not know when petitioner left Florida after Seda gave birth (Hrg. Tr. at 530–31). Chenoa testified that petitioner's appellate counsel was the first person to contact her about petitioner's case (Hrg. Tr. at 509), and that she would have testified at petitioner's trial had she been asked to (Hrg. Tr. at 510).

Minerva Godoy is the mother of petitioner's children and was his fiancé at the time of his arrest (Hrg. Tr. at 566). Godoy testified that petitioner left New York in May, 1996 intending to relocate in Florida (Hrg. Tr. at 568). Godoy sent money to petitioner using Western Union in June 1996, but that money had to be sent to John Torres because petitioner did not have proper identification to receive a money transfer (Hrg. Tr. at 570–72). Godoy testified that she informed petitioner's "female attorney" of the money transfer and that she telephoned petitioner in Florida on multiple occasions in June, 1996 (Hrg. Tr. at 580). Godoy recalled that petitioner called her the day after John and Seda's baby was born and told her that he was going to see their baby (Hrg. Tr. at 618).

Denise Hernandez testified that she and petitioner dated in Florida from about February, 1996 until some time in June of 1996, and that during that time she saw petitioner approximately four times per week (Hrg. Tr. at 627–28). Hernandez could not attest to petitioner's whereabouts on June 19, 1996 or the days immediately before or after that day. All Hernandez could recall was that she and petitioner had an argument in Florida in mid to late June because petitioner had taken her car without permission (Hrg. Tr. at 628). Hernandez believed the argument occurred close to the day of the

shooting because her sister's birthday present was in the car when petitioner took it, and her sister's birthday is June 26 (Hrg. Tr. at 629). Hernandez testified that she broke up with petitioner, in Florida, about two weeks before he left for New York (Hrg. Tr. at 629).

Lisette Rivera is a friend of Denise Hernandez who testified that she was present when petitioner took Hernandez's car in approximately June, 1996 (Hrg. Tr. at 672). Rivera believed the incident occurred about five days before Hernandez's sister's birthday; however, she also testified that she believed the sister's birthday was in mid-June rather than late June (Hrg. Tr. at 673). Before Rivera learned the date of the shooting for which petitioner was convicted, she submitted an affidavit that she saw petitioner regularly in Florida between June and November of 1996 (Hrg. Tr. at 698).

Both Hernandez and Rivera admitted that they had been in touch with petitioner since his conviction and had written and visited with him at least twice (Hrg. Tr. at 633, 677).

Michael Serrano testified that he was a good friend of John Torres' brother, Robert, and knew petitioner while he was staying with John Torres in June, 1996 (Hrg. Tr. at 718). Though Serrano could not recall the date that Jenine and John's baby was born, he remembered that he was with petitioner, Robert Torres and Ricardo Ruiz outside Jenine and John's home when John returned from the hospital on the day of the child's birth (Hrg. Tr. at 719, 732). Serrano testified he was never contacted by anyone regarding petitioner's case until an investigator reached him in 2002. Serrano also stated that he would have testified at petitioner's trial had he been asked (Hrg. Tr. at 722–24).

After hearing all the foregoing testimony and considering additional written sub-

missions, Justice Davidowitz denied petitioner's motion to vacate, holding that Hartsfield and Kaiser provided petitioner with "meaningful representation" as required by *People v. Benevento,* 91 N.Y.2d 708, 697 N.E.2d 584, 674 N.Y.S.2d 629 (1998). This standard for ineffectiveness is "ultimately concerned with the fairness of the process as a whole ..." (440 Order at 15, 22). Justice Davidowitz found that although both Hartsfield and Kaiser were mistaken regarding whether Justice Fisch had granted funding to investigate in Florida, that mistake "was not deliberate" and "does not alter the fact that both attorneys represented defendant skillfully, and with integrity ..." (440 Order at 18). Justice Davidowitz concluded that Kaiser presented a credible alibi defense to the jury and a number of the witnesses who testified at the post-conviction hearing would not have strengthened the alibi defense (440 Order at 17–19). Justice Davidowitz also held that trial counsel's performance should not upset the jury's verdict, as the verdict was "amply supported by the evidence" (440 Order at 19–22).

In addition, Justice Davidowitz found that the testimony of the alibi witnesses petitioner presented at his hearing was not "newly discovered evidence" because: (1) petitioner knew who the witnesses were and gave their names to police at the time of his arrest; (2) the substance of the alibi witness' testimony was known before trial and (3) counsel had made efforts to speak to the witnesses prior to petitioner's trial. Moreover, Justice Davidowitz found that the testimony of these witnesses would have been merely cumulative of the testimony of the alibi witnesses presented at petitioner's trial (440 Order at 19–20).

Justive Davidowitz's decision constitutes a ruling on the merits of petitioner's ineffective assistance claim and is, therefore, entitled to the AEDPA's deferential standard or review. "An 'adjudication on the merits' is one that '(1) disposes of the claim on the merit s, and (2) reduces its disposition to judgment.'" *Bell v. Miller,* 500 F.3d 149, 155 (2d Cir.2007), *quoting Sellan v. Kuhlman,* 261 F.3d 303, 312 (2d Cir. 2001). Justice Davidowitz expressly found that petitioner had received "meaningful representation" (440 Order at 18). The use of this language, along with the absence of any suggestion in Justice Davidowitz's decision of a procedural basis for the ruling, constitutes an adjudication of the merits of petitioner's federal ineffective assistance claim, sufficient to entitle Justice Davidowitz's decision to the AEDPA'a deferential standard of review. *Gersten v. Senkowski,* 426 F.3d 588, 698, 606 (2d Cir.2005); *Eze v. Senkowski,* 321 F.3d 110, 123–24 (2d Cir.2003); *Loliscio v. Goord,* 263 F.3d 178, 193 (2d Cir.2001); *Acencio v. McKinney,* 05–CV–1026 (NGG), 2007 WL 2116253 at *14 & n. 19 (E.D.N.Y. July 20, 2007).[8]

b. *Failure to Investigate and Present Additional Alibi Evidence as Ineffective Assistance of Counsel*

In order to prevail on a claim of ineffective assistance of trial counsel, the petitioner here must show that the State Supreme Court unreasonably applied the now familiar two-part test set forth in *Strick-*

---

**8.** As discussed in *Henry v. Poole,* 409 F.3d 48, 68–72 (2d Cir.2005) and in *Acencio v. McKinney, supra,* 2007 WL 2116253 at *14, the Court of Appeals for the Second Circuit has expressed some doubt as to whether a finding of "meaningful representation" will always constitute a finding that federal Sixth Amendment standards have been met. However, it appears to be the law in this Circuit that a state court's finding of "meaningful representation," where the state court was aware of a defendant's federal claim and the federal standard, constitutes an adjudication on the merits of a Sixth Amendment ineffective assistance claim. *See Eze v. Senkowski, supra,* 321 F.3d at 121–22.

*land v. Washington,* 466 U.S. 668, 686–87, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984):

> The benchmark for judging any claim of ineffectiveness must be whether counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result.
>
> . . . .
>
> A convicted defendant's claim that counsel's assistance was so defective as to require reversal of a conviction ... has two components. First, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as "counsel" guaranteed by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable. Unless a defendant makes both showings, it cannot be said that the conviction ... resulted from a breakdown in the adversary process that renders the result unreliable.

*Accord Lynn v. Bliden,* 443 F.3d 238, 247 (2d Cir.2006), *cert. denied,* 549 U.S. 1257, 127 S.Ct. 1383, 167 L.Ed.2d 168 (2007); *Davis v. Greiner,* 428 F.3d 81, 87 (2d Cir.2005); *Greiner v. Wells,* 417 F.3d 305, 319 (2d Cir.2005), *cert. denied,* 546 U.S. 1184, 126 S.Ct. 1363, 164 L.Ed.2d 72 (2006); *Aeid v. Bennett,* 296 F.3d 58, 62–63 (2d Cir.2002); *Hernandez v. United States,* 202 F.3d 486, 488 (2d Cir.2000); *Guerrero v. United States,* 186 F.3d 275, 281–82 (2d Cir.1999); *McKee v. United States,* 167 F.3d 103, 106–07 (2d Cir.1999); *Jackson v. Leonardo,* 162 F.3d 81, 85 (2d Cir.1998).

In determining whether counsel's performance was objectively deficient, courts "must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the [petitioner] must overcome the presumption that, under the circumstances, the challenged action might be considered sound trial strategy." *Strickland v. Washington,* supra, 466 U.S. at 689, 104 S.Ct. 2052 (internal quotation marks omitted).

The second prong of the test—actual prejudice—requires the petitioner to show that, but for trial counsel's errors, there is a "reasonable probability" that the result of the trial would have been different. "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Strickland v. Washington,* supra, 466 U.S. at 694, 104 S.Ct. 2052. Because the test is conjunctive, a habeas petitioner's failure to satisfy either prong requires that the challenge to the conviction be rejected. *Strickland v. Washington,* supra, 466 U.S. at 697, 104 S.Ct. 2052.

Petitioner claims that but for his trial counsel's failure to adequately investigate and present his alibi defense there is a reasonable probability that the jury would not have found him guilty of Collazo's murder and that Justice Davidowitz's decision denying petitioner's ineffective assistance of counsel claims was both contrary to, and an unreasonable application of, clearly established federal law. I agree with petitioner that under the *Strickland* two-part test, petitioner's counsel performed below constitutionally reasonable standards, and counsel's deficient performance caused petitioner to suffer prejudice at his trial. However, applying AEDPA's "objective" standard articulated by the Supreme Court in *Williams v. Taylor, supra,* 529 U.S. at 412, 120 S.Ct. 1495, I find that the State Court's decision denying petitioner's motion to vacate was neither an unreasonable application of, nor contrary to, clearly established federal law. Thus petitioner's

claim for habeas corpus relief based on ineffective assistance of trial counsel should be denied because it fails to reach the threshold for relief required by the AEDPA.

### c. *The Strickland Standard and the Merits of Petitioner's Claim*

#### i. *Deficient Performance*

Defense counsel "has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary." *Strickland v. Washington, supra,* 466 U.S. at 690–91, 104 S.Ct. 2052. Counsel's duty to investigate "includes the obligation to investigate all witnesses who may have information concerning [the defendant's] guilt or innocence." *Towns v. Smith,* 395 F.3d 251, 258 (6th Cir.2005).

After successfully contacting only Robert and Fernando Torres, Hartsfield believed that it was necessary to send an investigator to Florida in order to prepare petitioner's alibi defense adequately. Hartsfield drafted Franklin's affidavit in which Franklin described her difficulties contacting witnesses who had moved or who did not have telephones. Hartsfield also recalled that it was important for Franklin to go to Florida to have "face-to-face conversation[s]" with Robert and Fernando Torres, to obtain additional leads for witnesses, and to establish petitioner's exact movements (Hrg. Tr. at 44–45). Yet, the only explanation Hartsfield could offer for not sending Franklin to Florida was that funding would have been difficult to arrange (Hrg. Tr. at 50–52). Even though Franklin eventually located two key alibi witnesses, John Torres and Jenine Seda, Hartsfield admitted that she made no conscious strategic choice to limit the alibi witnesses to John and Seda (Hrg. Tr. at 73). Hartsfield had also been informed, either through her investigator or petitioner's post-arrest statement, of several possible items of documentary evidence that tended to support petitioner's alibi, yet she made no efforts to obtain any of them (Hrg. Tr. at 32).

Kaiser's performance was also lackluster. Kaiser never contacted Franklin to discuss her investigation (Hrg. Tr. at 422). Kaiser never reviewed the record to determine if Hartsfield's motion for funding to send an investigator to Florida had been granted. Kaiser never conducted an investigation in Florida due to his mistaken belief that Hartsfield's motion for funding had been denied. Rather, Kaiser worked "as best he could" from New York to secure petitioner's witnesses (Dec. 31, 2003 Kaiser Affirm.).

A failure to investigate that is a result of inattention rather than strategic judgment is unreasonable conduct for defense counsel. *Wiggins v. Smith,* 539 U.S. 510, 526, 123 S.Ct. 2527, 156 L.Ed.2d 471 (2003). "Strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation." *Strickland v. Washington, supra,* 466 U.S. at 690–91, 104 S.Ct. 2052. At the time Justice Fisch granted Hartsfield's requests for funds for a Florida investigation, Franklin had the full names of at least eleven potential alibi witnesses that petitioner believed would still be Deltona, Florida. Franklin had acquired addresses for at least five of these individuals, whom she had been unable to reach by telephone. These include Chenoa Ruiz, Ricardo Ruiz, Nerida Colon, John Torres and Jenine Seda (Post–Arrest Stmnt.; Jessie Franklin's notes, dated Sept. 23, 1996, annexed as Exhibit 19 to Miller Decl.). Within three days of his arrival in Florida, the investigator working for petitioner's post-conviction counsel was able to locate and interview several of the named but uncalled alibi witnesses whom

trial counsel never interviewed, namely Chenoa Ruiz, Margarita Torres and Jeremy David Guzman (Affidavit of Joseph Barry, sworn to June 4, 2003, annexed to motion for an order pursuant to N.Y.Crim. Proc. L. § 440.10 vacating judgment, annexed as Exhibit 5 to Resp. Op.). The investigator also interviewed Fernando Torres, with whom Franklin, and possibly Kaiser, had only spoken by telephone. Thus, it appears that if Kaiser or Hartsfield had initiated an investigation in Florida, they would have been able to meet Fernando in person, as well as locate and interview Chenoa Ruiz, both of whom testified at petitioner's 440 hearing that they saw petitioner in Florida on June 19 and would have testified at petitioner's trial.

In this case, counsels' failure to locate and interview the potential witnesses whom petitioner had identified concerning a viable defense cannot be deemed strategic; it was only by contacting the witnesses that counsel could determine whether they could help petitioner's case or lead counsel to additional defense witnesses or evidence. *See Garcia v. Portuondo,* 459 F.Supp.2d 267, 287–89 (S.D.N.Y.2006). Thus, Hartsfield and Kaiser's failure to conduct an investigation that would have uncovered additional alibi witnesses, including Chenoa Ruiz, and/or other evidence, of whose existence counsel had already been informed, was constitutionally deficient performance.

Assuming Kaiser knew before petitioner's trial that Fernando Torres could have provided useful testimony regarding petitioner's alibi[9], Kaiser's decision not to pursue Fernando as a witness appears to have been based on a mistaken belief that he could not obtain funds for his travel expenses, and the decision was flawed because it was not based on "a plausible strategic calculus or an adequate pre-trial

investigation." *Pavel v. Hollins,* 261 F.3d 210, 221–22 (2d Cir.2001); *see also Tosh v. Lockhart,* 879 F.2d 412, 414 (8th Cir.1989) (counsel's performance was deficient for failing to procure witness testimony that counsel knew was relevant). Insofar as Kaiser believed that Fernando did not want to testify for reasons of expense and inconvenience, it was still unreasonable for Kaiser to forgo Fernando's testimony. *See Washington v. Smith,* 219 F.3d 620, 630 (7th Cir.2000) ("... placing witness convenience above the vital interests of [a] client does not make [a defense attorney's] decision reasonable—or even really strategic") Even if Kaiser had been reasonable in his mistaken belief that Justice Fisch had not approved funding for investigative expenses for a Florida investigation, that did not excuse Kaiser from requesting assistance under a statute that permitted the Trial Court to order reimbursement of a defendant's indigent witness' reasonable travel expenses. *See* McKinney's CPL § 610.50(2). Kaiser's failure to take advantage of available procedural mechanisms to help secure the production of key witnesses was performance falling below a reasonable professional standard. *See Batten v. Griener,* 97 Civ. 2378, 2003 WL 22284187 at *9 (E.D.N.Y.2003). Kaiser's failure to procure witnesses, which was based on Kaiser's failure to review the record and accurately learn the outcome of the motion for investigative fees, cannot be considered reasonable or strategic. Hence, his failure to arrange Fernando's presence at trial was constitutionally deficient. *See Noble v. Kelly,* 89 F.Supp.2d 443, 463 (S.D.N.Y.2000).

Respondent suggests that since Fernando's testimony "mimicked" his son's trial testimony, defense counsel might have purposely decided not to use it because it

---

**9.** As noted at page 570, above, Kaiser was not sure whether he had spoken to Fernando Tor- res prior to petitioner's trial (Hrg. Tr. at 124).

was "'unnecessarily cumulative'" (Resp. Op. at 8 *quoting United States v. Luciano,* 158 F.3d 655, 660 (2d Cir.1998)). Hartsfield's testimony at the 440 hearing does not indicate she decided to forgo any alibi witness testimony as cumulative; to the contrary, she believed additional witnesses could have helped depending on how those individuals would present at trial (Hrg. Tr. at 95). While Kaiser testified that Fernando Torres did not have new information to add to petitioner's other alibi witnesses, Kaiser also admitted that he was not sure he ever spoke with Fernando. Kaiser had no notes documenting any conversations with Fernando, and Fernando did not recall ever speaking with Kaiser (Hrg. Tr. at 193, 353–54). Kaiser also testified that he did not ask additional potential witnesses to testify because they had told him that traveling to New York would have been a hardship for them, and Kaiser believed that they would not be reimbursed for traveling expenses (Hrg. Tr. at 225). Therefore I cannot find that defense counsel concluded that Fernando's testimony would have been unnecessary and cumulative, or that counsel made any strategic choices regarding Fernando's testimony.

For the reasons stated above, I find that Hartsfield's and Kaiser's performances were objectively deficient for failing to adequately investigate petitioner's alibi and present additional witnesses at his trial.

ii. *Prejudice*

As to the prejudice prong of *Strickland,* I conclude that there was a reasonable probability that Fernando and Chenoa's testimony would have affected the outcome of petitioner's trial

To show prejudice as a result of his counsel's failure to call additional alibi witnesses, petitioner must show that the uncalled witness would have provided relevant, non-cumulative testimony. *United*

*States v. Luciano, supra,* 158 F.3d at 660–62. Only two of the seven witnesses presented at the 440 hearing, Fernando Torres and Chenoa Ruiz, actually testified to seeing petitioner in Florida on June 19.

At petitioner's 440 hearing, Fernando testified consistently with John Torres that he spent part of June 19 with petitioner searching for car parts, and Chenoa testified that she saw petitioner twice on June 19 at the home of John Torres and Jenine Seda. Respondents argue that the testimony of Fernando and Chenoa was cumulative to John Torres and Jenine Seda's testimony, and therefore, petitioner's counsel cannot be found ineffective for failing to present Fernando and Chenoa at trial (Resp. Op. at 8, 9–10).

A habeas petitioner cannot satisfy the prejudice prong of *Strickland* by showing that defense counsel failed to present exculpatory witnesses that would have been merely corroborative of or cumulative to those who testified at trial. *See United States v. Luciano, supra,* 158 F.3d at 660–62. Even though Fernando's testimony about June 19 was repetitive of his son's, cumulative or repetitive evidence will carry some weight "in a situation where inconsistent testimony and credibility are at issue." *United States v. Puco,* 338 F.Supp. 1252, 1254 (1972). Fernando's testimony was significant and non-cumulative because it would not have been as susceptible to impeachment as his son's testimony. The prosecutor argued in summation that both John Torres and Jenine Seda were "interested witnesses" who did not want to see *their* friend go to jail (Trial Tr. at 529). The Trial Judge instructed the jury that it could consider a friend of a defendant to be an interested witness whose testimony is biased (Trial Tr. at 558). Fernando, on the other hand, did not have a similar personal relationship with petitioner and could not have been impeached on that

ground. When the jury is faced with a pure credibility determination, disinterested witnesses can impact the determination and should not be considered cumulative. *See Montgomery v. Petersen*, 846 F.2d 407, 413 (7th Cir.1988) (additional alibi witness would not have been cumulative despite testimony by several other witnesses, where the additional witness did not suffer from the same credibility problems as the others); *Bohan v. Kuhlmann*, 234 F.Supp.2d 231, 251 (S.D.N.Y.2002) (trial court erred in excluding testimony of alibi witness who, if credited by the jury, would have "bolstered the testimony of [petitioner's] other alibi witnesses."); *see also Bigelow v. Williams*, 367 F.3d 562, 575 (6th Cir.2004) (disinterested witnesses' testimony would not have been cumulative); *Washington v. Smith*, 219 F.3d 620, 634 (7th Cir.2000) (rejecting state appellate court's conclusion that uncalled alibi witnesses' testimony would have been repetitive and thus cumulative; petitioner's whereabouts at the time of the crime was not an established fact, and the witnesses would have added credibility to petitioner's alibi defense.) [10]

Respondent also claims that Fernando's testimony is not credible because he may have been "honestly mistaken" about seeing petitioner on June 19 (Resp. Op. at 7). Respondent points out that Franklin's notes of her conversation with Fernando state that Fernando was with petitioner looking for car parts in "latter June," rather than stating that Fernando reported doing so specifically on June 19 (Resp. Op. at 7). However, respondent offers no evidence that when Franklin spoke to Fernando in October, 1996, Franklin had asked Fernando specifically about June 19,

or that Franklin had told Fernando that June 19 was the date of the crime for which petitioner was arrested. Moreover, respondent's argument is applicable to any uncalled witness, and, if accepted, all claims of ineffective assistance could never be predicated on counsel's failure to call a witness.

Respondent also argues that Fernando's 2004 hearing testimony was unreliable because he failed to remember other details, such as his conversations with Kaiser and Franklin, what day of the week Seda was admitted to the hospital to give birth, when John and Seda moved to Pennsylvania, when petitioner traveled to and from Florida, and when petitioner was incarcerated in Florida (Resp. Op. at 7–9). Respondent's argument is unavailing. Fernando's inability to recall those other details does not necessarily mean Fernando's memory is flawed regarding June 19, 1996, the day before his first grandson was born. Moreover, since Fernando was not a close friend of petitioner, he would have no reason to remember when petitioner traveled or was incarcerated. Fernando's inability to remember these details does not excuse Kaiser's failure to communicate more fully with Fernando and to produce him as a witness at petitioner's trial.

Respondent argues that Chenoa Ruiz's testimony was also completely cumulative because her testimony would have placed petitioner at the same exact location during the same time periods as John Torres and Jenine Seda (Resp. Op. at 9–10). Chenoa testified, however, that she was not friends with petitioner; to the contrary, Chenoa testified that she did not

---

**10.** Respondent argues that, despite the prosecution's position at trial, Jenine Seda was not an interested witness and that petitioner's counsel did, therefore, offer disinterested alibi witness testimony at trial (Resp. Op. at 18–20). At petitioner's trial, the prosecution's

summation clearly accused Seda, with whom petitioner had lived, of being interested and potentially biased towards petitioner (Trial Tr. at 529). Given the prosecution's argument at trial, respondent's claimed recent epiphany is impossible to credit.

like petitioner because she believed his presence was making things more difficult for Seda during her pregnancy (Hrg. Tr. at 500–03). Thus, like Fernando Torres, Chenoa could not have been impeached on the ground of bias, and her testimony would not have been cumulative to that of John Torres and Jenine Seda.

Respondent also makes several unpersuasive attempts to discredit Chenoa.

Respondent first argues that Chenoa was not credible because although she recalled seeing petitioner on June 19, she could not remember when petitioner traveled back and forth between Florida and New York during his previous Florida trip, and she did not know exactly when petitioner left Florida in the end of June, 1996 (Resp. Op. at 10–12). Chenoa testified that she specifically recalled seeing petitioner at Seda's apartment on June 19 because she took Seda to the doctor that day and Seda's baby was born the following day (Hrg. Tr. at 548, 550). In addition, Chenoa testified that she had heard only a few weeks after June 19 that petitioner was arrested for a crime that occurred that day (Hrg. Tr. at 506–07). Hence, Chenoa's precise memory of seeing petitioner on June 19 is explainable because there were other significant events connected with that day and the following day. There were no other similar landmark events in Chenoa's life to mark the other dates about which she was asked. Thus I do not agree with respondent that Chenoa's 440 testimony was unreliable because she could not recall petitioner's whereabouts on dates other than June 19.

I also disagree with Respondent that the fact that petitioner sent a single letter to Chenoa during the eight years in which he was incarcerated shows that Chenoa was biased. Chenoa testified that when petitioner was in Florida, he became friendly with her infant children and their father, that petitioner wrote mainly to inquire about the children, and that petitioner's letter did not mention his case (Hrg. Tr. at 524). In addition, there is no evidence of any friendly relationship between petitioner and Chenoa prior to petitioner's trial. Respondent's allegation regarding petitioner's letter to Chenoa is not sufficient to conclude that petitioner ever had, let alone maintained, a close relationship with Chenoa.

Respondent also contends that Chenoa is unreliable because she had previously prepared a written statement that lacked some of the details she provided in her testimony, and merely stated that she knew petitioner was in Florida on June 19 because she saw him that day (Resp. Op. at 10). The omission of details from Chenoa's written statement does not call her reliability into question. There is no indication that anyone requested that Chenoa write a detailed statement that included everything she could remember about petitioner on June 19. Thus, there is no basis to conclude that, because she submitted a sparse written statement, Chenoa either lied or reconstructed details upon testifying at petitioner's 440 hearing. *See Victory v. Bombard*, 570 F.2d 66, 70 (2d Cir.1978) (statements witness made to a detective were not prior inconsistent statements merely because they omitted details disclosed by that witness' testimony).

No physical evidence was presented at petitioner's trial connecting petitioner to Collazo's murder; the prosecution relied solely on the eyewitness identifications of two individuals, Sanchez and Davis, neither of whom had ever met petitioner. Sanchez testified that he only saw petitioner for a minute, and Davis, who was about fifteen feet away from the shooting, appears to have witnessed the relevant events for only several seconds (Trial Tr. at 150, 53–58). A third eyewitness, Jose Diaz, believed he would be able to recog-

nize the perpetrator yet did not identify petitioner in court (Trial Tr. at 295–96).

Eyewitness evidence, uncorroborated by physical evidence, is not overwhelming evidence. *Griffin v. Warden, Maryland Correctional Adjustment Center,* 970 F.2d 1355, 1359 (4th Cir.1992) ("[e]yewitness identification evidence, uncorroborated by a fingerprint, gun, confession, or coconspirator testimony, is a thin thread to shackle a man for forty years."). Eyewitness identification by a stranger is even more susceptible to error than identification by someone who is otherwise familiar with an alleged perpetrator. *See Kampshoff v. Smith,* 698 F.2d 581, 585 (2d Cir. 1983) ("The identification of strangers is proverbially untrustworthy" *quoting* Felix Frankfurter, *The Case of Sacco & Vanzetti* 30 (1927).).

The addition of Fernando Torres and Chenoa Ruiz would have presented the jury with a total of four alibi witnesses to contradict the prosecution's two eyewitnesses, and Fernando and Chenoa were substantially disinterested in the outcome of the trial.[11] "In a case involving identification and identification alone, it is not easy to imagine a defense lawyer who would pass on the chance to bolster the defense with [additional alibi witnesses]—particularly since eyewitness evidence is 'precisely the sort of evidence that an alibi defense refutes best.'" *See Bigelow v. Williams, supra,* 367 F.3d at 576 *quoting*

*Griffin v. Warden, Maryland Correctional Adjustment Center, supra,* 970 F.2d at 1359.

In light of the thin evidence presented by the prosecution at petitioner's trial, the additional alibi testimony from Fernando and Chenoa presented at petitioner's post-conviction hearing was sufficient to "undermine confidence in the outcome" of petitioner's trial. *Strickland, supra,* 466 U.S. at 694, 104 S.Ct. 2052. Thus I find that petitioner has satisfied both prongs of *Strickland.* Nevertheless, I cannot conclude that the state court's holding to the contrary was an unreasonable application of, or contrary to, Supreme Court precedent.

d. *Application of the AEDPA Standard to Petitioner's Claim*

As discussed above, Justice Davidowitz rejected petitioner's ineffective assistance of counsel claim, applying New York State's "meaningful representation" standard as articulated by the New York Court of Appeals in *People v. Benevento, supra,* 91 N.Y.2d 708, 697 N.E.2d 584, 674 N.Y.S.2d 629. This standard for analyzing claims of ineffective assistance of counsel "is ultimately concerned with the fairness of the process as a whole rather than its particular impact on the outcome of the case." *People v. Benevento, supra,* 91 N.Y.2d at 714, 697 N.E.2d at 588, 674

---

11. None of the other five witnesses at petitioner's hearing, or items of documentary evidence presented and described, establish petitioner's presence in Florida on the day of the shooting. The failure to offer this evidence could not, therefore, have prejudiced petitioner. *United States v. Luciano, supra,* 158 F.3d at 660–62 (to show prejudice from the failure of counsel to call witnesses, petitioner must show that the uncalled witnesses would have provided relevant testimony); *Buitrago v. Scully,* 705 F.Supp. 952, 954 (S.D.N.Y.1989) (counsel not ineffective for failing to present alibi witness where petitioner fails to show

witness knew where petitioner was at the time of the crime); *United States v. Puco,* 338 F.Supp. 1252, 1254 (D.C.N.Y.1972) (witness' testimony that he was with the defendant during the afternoon the day of the crime is not relevant alibi evidence when the crime occurred in the evening). Since the failure to call these witnesses and offer this evidence could not have prejudiced petitioner, there is no need to address whether counsel's failure to offer this evidence constituted deficient performance. *Strickland v. Washington, supra,* 466 U.S. at 697, 104 S.Ct. 2052.

N.Y.S.2d at 633. Petitioner argues that Justice Davidowitz's application of the "meaningful representation" standard was both contrary to, and an unreasonable application of *Strickland* (Pet. Reply at 16).

In his 440 Decision and Order, Justice Davidowitz looked at a number of issues routinely considered by New York courts in analyzing whether or not counsels' errors amounted to ineffective assistance, such as did counsel perform competently in other respects and were counsels' errors so seriously prejudicial as to compromise a defendant's right to a fair trial (440 Order at 16–17, *citing People v. Flores*, 84 N.Y.2d 184, 639 N.E.2d 19, 615 N.Y.S.2d 662 (1994), *People v. Aiken*, 45 N.Y.2d 394, 380 N.E.2d 272, 408 N.Y.S.2d 444 (1978), and *People v. Adams*, 12 A.D.3d 523, 783 N.Y.S.2d 867 (2d Dep't 2004)). Justice Davidowitz concluded that both attorneys filed all appropriate motions, conducted an investigation that was "within the scope of information" available to them, competently examined witnesses and made competent opening and closing statements, and, "most importantly, a credible alibi defense was presented to the jury" (440 Order at 17). Without specifically addressing the testimony of Fernando Torres and Chenoa Ruiz, Justice Davidowitz then concluded that the witnesses presented at the hearing were "questionable" and "not as persuasive as [John Torres and Jenine Seda] who ... were rejected by the jury" (440 Order at 21–22). Thus, Justice Davidowitz found that the outcome of petitioner's trial was "unimpeached and 'amply supported by the evidence' " (440 Order at 22, *quoting People v. Jackson*, 74 A.D.2d 585, 424 N.Y.S.2d 484 (2d Dep't 1980), *aff'd*, 52 N.Y.2d 1027, 420 N.E.2d 97, 438 N.Y.S.2d 299(1981)). Petitioner argues that Justice Davidowitz's "meaningful representation" analysis was contrary to *Strickland* (Pet. Mem. at 39).

The Second Circuit has repeatedly held that New York's "meaningful representation" standard for analyzing habeas claims of ineffective assistance of counsel, as articulated in *People v. Benevento, supra*, 91 N.Y.2d at 714, 697 N.E.2d at 588, 674 N.Y.S.2d at 633, is not contrary to *Strickland. See Eze v. Senkowski*, 321 F.3d 110, 122–23 (2d Cir.2003); *Lindstadt v. Keane, supra*, 239 F.3d at 198. Nevertheless, petitioner argues that the Second Circuit's more recent opinion in *Henry v. Poole, supra*, 409 F.3d 48, "suggested that New York's 'flexible' focus on the overall fairness of the petitioner's trial might dilute *Strickland's* prejudice standard by requiring something more than a reasonable probability of a different outcome" (Pet. Mem. at 39, *quoting Henry v. Poole, supra*, 409 F.3d at 70–71). Specifically, the Court noted in *Henry* that

> in light of the *Strickland* principle that an ineffective assistance claim is established if the court concludes that there is a reasonable probability that but for counsel's professionally deficient performance the outcome of the proceeding would have been different, we find it difficult to view so much of the New York rule as holds that *"whether defendant would have been acquitted of the charges but for counsel's errors is ... not dispositive," Benevento*, 91 N.Y.2d at 714, 674 N.Y.S.2d 629, 697 N.E.2d 584, ... as not "contrary to" the prejudice standard established by *Strickland.*

*Henry v. Poole, supra*, 409 F.3d at 71 (emphasis in original). Several District Court decisions within the Circuit have confirmed that *Henry* does question the continuing vitality of the Second Circuit prior decisions that found New York's "meaningful representation" is not contrary to *Strickland. Acencio v. McKinney*, 05–CV–1026 (NGG), 2007 WL 2116253 at *14 n. 20, (E.D.N.Y. July 20, 2007); *Remy v. Graham*, 06 CV 3637(JG), 2007

WL 496442 at *5 (E.D.N.Y. Feb. 12, 2007); *Baskerville v. Dennison,* 04 Civ. 10261(PKC), 2005 WL 3535067 at *6 (S.D.N.Y. Dec. 27, 2005). Nevertheless, the panels in both *Henry, supra,* 409 F.3d at 70, and *Eze v. Senkowski,* 321 F.3d 110, 124 (2d Cir.2003), expressly noted that, in the absence of an intervening Supreme Court or *en banc* Circuit decision, they were "bound" by the Circuit's precedents holding that New York's "meaningful representation" standard was not contrary to *Strickland.* Given that the Second Circuit has expressly found itself bound by these precedents, it would be clearly improper for me to conclude that I had greater discretion than the Court with the authority to set the law for the Circuit. Accordingly, I am bound by precedent to conclude that the "meaningful representation" standard is not contrary to *Strickland.* Nevertheless, I will consider petitioner's arguments that Justice Davidowitz's analysis of petitioner's ineffective assistance of counsel claim was contrary to *Strickland,* as doing so would not affect the outcome of this case.

Petitioner argues that Justice Davidowitz's analysis was contrary to *Strickland* because his opinion emphasized that Hartsfield and Kaiser's misunderstandings regarding the granting of expenses to investigate were unintentional errors. Petitioner contends this "honest heart" standard imposes a heavier burden on petitioner than *Strickland's* "reasonable professional" standard because it requires petitioner to demonstrate that trial counsel had an improper motive for his or her objectively deficient performance (Pet. Mem. at 39–40), *citing Cargle v. Mullin,* 317 F.3d 1196, 1204–05 (10th Cir.2003). I disagree with petitioner that Justice Davidowitz's opinion petitioner placed such a burden on petitioner. Unlike the petitioner in *Cargle,* petitioner here was not required to establish why his counsel failed to find and present additional witnesses

or evidence at his trial. *Cargle v. Mullin, supra,* 317 F.3d at 1205. Justice Davidowitz's opinion does not suggest that petitioner was required to show anything more than what *Strickland* requires: that his counsel were deficient and that because of such deficiency the outcome of his trial might have been different. Justice Davidowitz's opinion discussed the positive aspects of counsels' performance and counsels' "integrity" to support his conclusion that petitioner received a fair trial; he did not deny petitioner's motion for failing to establish that Kaiser and Hartsfield had improper motives. Hence, Justice Davidowitz's emphasis on counsel's lack of bad intentions was not contrary to, nor was it an unreasonable application of, the *Strickland* standard.

Petitioner also argues that Justice Davidowitz's opinion was contrary to *Strickland* because it relied on a formulation of prejudice that precludes relief where the verdict was "amply supported by the evidence" (440 Order at 22, *quoting People v. Jackson, supra,* 74 A.D.2d at 587, 424 N.Y.S.2d at 485), and that such a standard is diametrically different from *Strickland's* requirement that a petitioner show only a reasonable probability of acquittal had counsel performed adequately (Pet. Mem. at 40). When referring to *People v. Jackson, supra,* 74 A.D.2d at 587, 424 N.Y.S.2d at 485, Justice Davidowitz was not saying petitioner's motion should be denied simply because there was ample evidence in support of petitioner's guilt. Rather, he was merely taking into consideration the strength of respondent's case in reaching his conclusion. Consideration of the strength of the prosecution's case is completely appropriate under *Strickland v. Washington, supra,* 466 U.S. at 696, 104 S.Ct. 2052 ("[A] verdict or conclusion only weakly supported by the record is more likely to have been affected by errors than one with overwhelming record support.");

*Baskerville v. Dennison, supra,* 2005 WL 3535067 at *10 ("In assessing the question of prejudice, the Court must take into account the totality of the evidence before the trial court."). It was not contrary to or an unreasonable application of *Strickland* for the state court to find the prosecution's case was sufficiently strong that a jury verdict would have been the same if petitioner had presented additional alibi witnesses.

Petitioner also contends that Justice Davidowitz unreasonably applied *Strickland* by focusing on counsels' competent performance in other areas while assessing whether counsel was ineffective for failing to adequately investigate the alibi defense (Pet. Mem. at 42). Petitioner argues that the Court in *Henry v. Poole, supra,* 409 F.3d at 72, "noted that when the New York Court of Appeals emphasized 'counsel's competency in all other respects' in determining 'meaningful representation,' it was failing to apply the *Strickland* standard " 'at all' " " (Pet. Mem. at 39, *citing Henry v. Poole,* 409 F.3d at 72). However, the *Henry* court did not fault the New York Court of Appeals for *emphasizing* counsel's competency; the Court faulted it for "it's *reliance* " on counsel's competent performance in ways that were not the subject of the ineffectiveness claims. *Henry v. Poole, supra,* 409 F.3d at 72 (emphasis added). I disagree with petitioner's contention that Justice Davidowitz found that "counsel's competency in some areas of their legal representation [can] compensate for significant deficiencies in other areas" (Pet. Reply at 17). Rather, Justice Davidowitz looked at counsel's performance as a whole, including the alibi evidence that was presented at trial, to reach his conclusion that petitioner failed to demonstrate that further investigation in Florida could have resulted in a different jury verdict. In *Strickland* terms, Justice Davidowitz held that petitioner failed to show he was prejudiced by counsels' defi-

ciencies—a conclusion which, if reasonable, is sufficient by itself to deny habeas relief. *Strickland v. Washington,* supra, 466 U.S. at 697, 104 S.Ct. 2052 ("[A] court need not determine whether counsel's performance was deficient ... If it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice ... that course should be followed."). Although I would reach a different result if the matter were before me for *de novo* review, the evidence is not so one-sided that Justice Davidowitz's conclusion can be characterized as unreasonable. Hence I do not find that the state court's consideration of the totality of counsel's performance to have been contrary to or an unreasonable application of *Strickland.*

e. *Summary*

Accordingly, despite the merits of petitioner's ineffective assistance of counsel claim, I conclude that the state court's rejection of petitioner's claim is erroneous but not "unreasonable" or "contrary to" the United States Supreme Court's precedent in *Strickland.* Thus, in light of the deference owed to the state's decision under AEDPA, petitioner's claim for relief based on the ineffective assistance of counsel should be denied.

2. *Petitioner's Batson Claim*

Petitioner next claims that the prosecutor's use of her first six peremptory challenges to strike African–American jurors established a *prima facie* case of racial discrimination, and that the Trial Court erred by failing to require the prosecutor to provide race-neutral explanations for her choices as required by *Batson v. Kentucky,* 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986). Petitioner further argues that the Appellate Division's rejection of his *Batson* challenge was an unreason-

able application of the Supreme Court's precedent.

### a. *Jury Selection and State Court Proceedings*

The twelve jurors and three alternate jurors who heard the case against petitioner were selected through three rounds of *voir dire*. Because New York classifies murder as a Class A felony, both the prosecution and defense had twenty peremptory challenges, exclusive of challenges to potential alternate jurors. N.Y.Crim. Proc. L. § 270.25(a). It appears from the record that the jury was selected using the "jury box" system, commonly used in criminal trials in New York. Under this system, groups of prospective jurors, randomly selected from the venire, are called to the jury box and questioned. Counsel then exercise challenges for cause. After "for cause" challenges are resolved, counsel exercise their peremptory challenges. The process is repeated until a jury is empaneled. *See generally Sorto v. Herbert*, 497 F.3d 163, 166 (2d Cir.2007) (describing "jury box" selection system).

During the first round of jury selection in petitioner's case, sixteen venire persons were called to the jury box. Two were removed on consent (Jury Tr.[12] I at 88). After an unsuccessful challenge to one prospective juror for cause (Jury Tr. I at 90–92), the prosecution exercised four peremptory challenges, including a challenge to the prospective juror who was unsuccessfully challenged for cause (Jury Tr. I at 91). The defense exercised two peremptory challenges (Jury Tr. I at 92–93), and the remaining eight individuals were sworn in as jurors (Jury Tr. I at 94).

In the second round of jury selection, seventeen individuals were called to the jury box (Jury Tr. I at 100–02). After four of these individuals were excused on consent (Jury Tr. I at 156–60), Justice Fisch

asked counsel if they had any peremptory challenges as to the first four prospective jurors remaining in the second round (Jury Tr. I at 160). The prosecution challenged one of those four, and then the defense challenged two of them (Jury Tr. I at 161). Justice Fisch then invited counsel to exercise their peremptory challenges with regards to the next three jurors (Jury Tr. at 161). The prosecution challenged one of those three individuals (Jury Tr. I at 161).

At that point, the following colloquy occurred:

> [Defense Counsel:] Judge, most respectfully, and I hate to do it, but it's reached the point now where I notice a pattern of challenges that are consistent only by one factor and that's the race of the person that's being challenged, all of whom are black. Every single one of them.
>
> Now, granted this is the Bronx and there's a lot of black jurors and there's a couple or a few that she didn't take off, but the ones that she did take off without exception are Afr[ican]-Americans.
>
> THE COURT: Let['s] see if there is a pattern.
>
> (Whereupon, there is a brief pause in the proceedings.)
>
> THE COURT: I do not see a prima faci[e] case of exercised peremptory challenges by race. The People have exercised six peremptories of Afr[ican-]Americans and there were four that were not challenged by her, three of whom are jurors, one of them whom you challenged. I deny your challenge.
>
> [Defense Counsel:] All right.
>
> * * *

---

12. "Jury Tr." refers to the transcript of jury selection proceedings in petitioner's case.

THE COURT: As a matter of fact, I should say that five [African–Americans] were not challenged. Six were challenged, five were not.

[Defense Counsel:] Yeah, but I don't think—it's not necessarily who['s] not challenged. I think it is who is challenged.

THE COURT: All right, that's my ruling. I do not see a prima faci[e] case.

(Jury Tr. I at 161–63).

Defense counsel never raised any additional arguments concerning the prosecution's use of its peremptory challenges. The prosecution subsequently exercised four more peremptory challenges in the remainder of the second round and during the third round of jury selection (Jury Tr. I at 168, Jury Tr. II at 84–87). The record does not reflect the race of any of the subsequently challenged venire persons or the final racial make-up of the jury.

Petitioner argued on direct appeal that the prosecution's use of its first six peremptory challenges exclusively against African–Americans established a *prima facie* case of discrimination under *Batson*, and that the prosecution should have been required to provide race-neutral reasons for its challenges (App. Div. Br. at 46–49). The Appellate Division rejected petitioner's arguments, stating:

Defendant failed to make a prima facie showing of racial discrimination by the prosecution in the exercise of its peremptory challenges, particularly in light of the racial makeup of the panel of prospective jurors (*see, People v. Ware*, 245 A.D.2d 85, 665 N.Y.S.2d 869, *lv denied* 91 N.Y.2d 978, 672 N.Y.S.2d 858, 695 N.E.2d 727). The mere number of peremptory challenges exercised by the prosecution against African–Americans did not establish a prima facie case and defendant failed to show disparate treatment of similarly situated panelists or other relevant circumstances to raise an

inference of a discriminatory purpose (*see, People v. Jenkins*, 84 N.Y.2d 1001, 622 N.Y.S.2d 509, 646 N.E.2d 811; *People v. Bolling*, 79 N.Y.2d 317, 582 N.Y.S.2d 950, 591 N.E.2d 1136).

*People v. Rosario, supra,* 288 A.D.2d at 143, 733 N.Y.S.2d at 406–07.

The Appellate Division's decision clearly constitutes a decision on the merits of petitioner's *Batson*. It addresses the substance of the claim and does not remotely suggest any procedural deficiency. Accordingly, the Appellate Division's decision is entitled to the deferential standard of review set forth in the AEDPA, and relief can be granted only if the Appellate Division's decision was "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States." 28 U.S.C. § 2254; *Sorto v. Herbert, supra,* 497 F.3d at 169.

b. *Analysis*

In *Batson v. Kentucky, supra,* 476 U.S. at 79, 106 S.Ct. 1712, the Supreme Court held that a prosecutor may not use peremptory challenges to discriminate against potential jurors along racial lines. "[T]he Equal Protection Clause forbids the prosecutor to challenge potential jurors solely on account of their race or on the assumption that black jurors as a group will be unable impartially to consider the State's case against a black defendant." *Batson v. Kentucky, supra,* 476 U.S. at 89, 106 S.Ct. 1712.

The *Batson* Court formulated a three-part test "for assessing a prima facie case under the Equal Protection Clause."

The *Batson* Court ... establish[ed] a three-step burden-shifting framework for the evidentiary inquiry into whether a peremptory challenge is race-based, [476 U.S.] at 96–98, 106 S.Ct. 1712: First, the moving party—i.e., the party

challenging the other party's attempted peremptory strike—must make a prima facie case that the nonmoving party's peremptory is based on race. *Batson,* 476 U.S. at 96–97, 106 S.Ct. 1712; *Hernandez v. New York,* 500 U.S. 352, 358, 111 S.Ct. 1859, 114 L.Ed.2d 395 (1991). Second, the nonmoving party must assert a race-neutral reason for the peremptory challenge. *Batson,* 476 U.S. at 97–98, 106 S.Ct. 1712; *Hernandez,* 500 U.S. at 358–59, 111 S.Ct. 1859. The nonmoving party's burden at step two is very low. Under *Purkett v. Elem,* 514 U.S. 765, 115 S.Ct. 1769, 131 L.Ed.2d 834 (1995) (per curiam), although a race-neutral reason must be given, it need not be persuasive or even plausible. *Id.* at 768, 115 S.Ct. 1769. Finally, the court must determine whether the moving party carried the burden of showing by a preponderance of the evidence that the peremptory challenge at issue was based on race. *Batson,* 476 U.S. at 96, 98, 106 S.Ct. 1712; *Hernandez,* 500 U.S. at 359, 111 S.Ct. 1859.

*McKinney v. Artuz,* 326 F.3d 87, 97–98 (2d Cir.2003) (footnote omitted); *accord Sorto v. Herbert, supra,* 497 F.3d at 169–70; *Frazier v. New York,* 187 F.Supp.2d 102, 114 (S.D.N.Y.2002), *aff'd mem.,* 156 Fed. Appx. 423 (2d Cir.2005).

"To establish a *prima facie* case, 'a defendant must show facts and circumstances that raise an inference that the prosecutor used the peremptory challenge to exclude potential jurors from the petit jury on account of their race.'" *Sorto v. Herbert, supra,* 497 F.3d at 170, *quoting Overton v. Newton,* 295 F.3d 270, 276 (2d Cir.2002). The burden of making a *prima facie* showing under a *Batson* challenge is not onerous and is analogous to the burden borne by the plaintiff in a Title VII case to make out a *prima facie* case under the *McDonnell Douglas* test. *See Truesdale v. Sabourin,* 427 F.Supp.2d 451, 458–59 (S.D.N.Y.2006); *see also Williams v.*

*Burge, supra,* 2005 WL 2429445 at *5 ("[A] prima facie case under *Batson* demands only a 'minimal burden' from the claimant."). The party asserting the challenge need not show that it is more likely true than not that discriminatory animus underlies the adversary's conduct; all that need be shown to establish a *prima facie* case is "evidence sufficient to permit the trial judge to draw an inference that discrimination has occurred." *Johnson v. California,* 545 U.S. 162, 170, 125 S.Ct. 2410, 162 L.Ed.2d 129 (2005).

There is no formula for determining what showing is sufficient to establish a *prima facie* case of discriminatory use of peremptory challenges. *Tankleff v. Senkowski,* 135 F.3d 235, 249 (2d Cir.1998). Rather,

[i]n deciding whether the defendant has made the requisite [*prima facie*] showing, the trial court should consider all relevant circumstances. For example, a "pattern" of strikes against all black jurors included in the particular venire might give rise to an inference of discrimination. Similarly, the prosecutor's questions and statements during *voir dire* examination and in exercising his challenges may support or refute an inference of discriminatory purpose. These examples are merely illustrative.

*Batson v. Kentucky, supra,* 476 U.S. at 96–97, 106 S.Ct. 1712; *accord Overton v. Newton, supra,* 295 F.3d at 277–78; *see Isaac v. Greiner,* 01 Civ. 2178(PKC), 2005 WL 1713036 at *5 (S.D.N.Y. July 19, 2005).

"[T]he threshold decision concerning the existence of a *prima facie* case of discriminatory use of peremptory challenges involves both issues of fact and an issue of law." *United States v. Alvarado,* 891 F.2d 439, 443 (2d Cir.1989), *vacated on other grounds,* 497 U.S. 543, 110 S.Ct. 2995, 111 L.Ed.2d 439 (1990). Where the state courts have issued a decision on the merit

s concerning the existence of a *prima facie* case, that decision is entitled to the deferential standard of review set forth in the AEDPA. *Overton v. Newton, supra,* 295 F.3d at 277. Thus, a prisoner challenging the trial court's resolution of a *Batson* challenge through a habeas corpus petition has to overcome a "presumption of correctness":

> We review a district court's ruling on a petition for a writ of habeas corpus *de novo. See English v. Artuz,* 164 F.3d 105, 108 (2d Cir.1998). Because a trial court's determination of whether a juror was struck for a discriminatory reason turns largely on the judge's observations of the attorneys and prospective jurors and an evaluation of their credibility, "a reviewing court ordinarily should give those findings great deference." *Hernandez v. New York,* 500 U.S. 352, 364, 111 S.Ct. 1859, 114 L.Ed.2d 395 (1991). More particularly, when reviewing a *Batson* challenge in the context of a habeas petition, a trial court's conclusion that a peremptory challenge was not exercised in a discriminatory manner is entitled to a presumption of correctness, except, *inter alia,* to the extent that the trial court did not resolve the factual issues involved in the challenge or if the finding is not fairly supported by the record. *See* 28 U.S.C. §§ 2254(d)(1) (presumption of correctness not applicable if "the merits of the factual dispute were not resolved in the State court hearing") and (d)(8) (1994) (presumption of correctness not applicable if state court's "factual determination is not fairly supported by the record"); *see also Purkett v. Elem,* 514 U.S. 765, 769, 115 S.Ct. 1769, 131 L.Ed.2d 834 (1995) ("[T]he factual findings of state courts are presumed to be correct, and may be set aside, absent procedural error, only if they are not fairly supported by the record.") (internal quotation marks omitted); *Washington v. Schriver,* 240 F.3d

101, 110 (2d Cir.2001) (stating that the factual findings of state trial and appellate courts are entitled to a presumption of correctness absent special circumstances, including a determination that the factual finding is not fairly supported by the record).

*Galarza v. Keane, supra,* 252 F.3d at 635 (footnote omitted). The burden is on petitioner to rebut the trial court's presumption of correctness by clear and convincing evidence. *Williams v. Burge,* 04 Civ. 2590(PKC), 2005 WL 2429445 at *3 (S.D.N.Y. Oct. 3, 2005), *quoting Parsad v. Greiner,* 337 F.3d 175, 181 (2d Cir.2003). Hence, "[a] federal court reviewing a state court determination that no *prima facie* [case] existed must accord substantial deference to that determination." *Williams v. Burge, supra,* 2005 WL 2429445 at *3.

In light of the deferential standard of review afforded to state court decisions in the context of a habeas corpus petition, the Court of Appeals seems to have suggested that a finding on a direct appeal in a federal criminal case that a particular set of facts supports a *Batson prima facie* case does not necessarily imply that a state court's decision reaching the opposite result on the same facts is contrary to or constitutes an unreasonable application of federal law. *Sorto v. Herbert, supra,* 497 F.3d at 172; *Overton v. Newton, supra,* 295 F.3d at 280 n. 12.

Finally, since the petitioner in a habeas proceeding bears the burden of demonstrating a violation of his constitutional rights, deficiencies in the record that make it impossible to determine whether the evidence supports an inference of discrimination require that the claim be rejected. *Sorto v. Herbert, supra,* 497 F.3d at 172–73.

Petitioner contends that he made out a *prima facie* case under *Batson* because the prosecution's use of peremptory challenges

against African–Americans was grossly disproportionate to the percentage of African–Americans who made up the pool of prospective jurors after challenges for cause and after jurors had been excused on consent. Specifically, at the time the *Batson* challenge was made, a total of 33 prospective jurors had been called to be questioned; a total of six had been excused on consent; and the Trial Court had invited counsel to exercise peremptory challenges against a total of 21 prospective jurors.[13] The prosecution made peremptory challenges directed at six African–Americans; the Trial Court noted that there were five African–Americans who the prosecution did not challenge. Thus, of the 21 prospective jurors against whom the prosecution could have made peremptory challenges, 11, or 52%, were African–Americans, yet 100% of the prosecution's peremptory challenges were directed at African–Americans.

Analogous facts were presented in *United States v. Alvarado*, 923 F.2d 253 (2d Cir.1991) in which the prosecution exercised its peremptory challenges against two African–American prospective jurors, two white prospective jurors and one Hipanic prospective juror. The prosecution waived its sixth peremptory challenge. In addition, the prosecution used the one peremptory challenge it had for alternate jurors to strike an African American. *United States v. Alvarado, supra,* 923 F.2d at 255.

After assuming that minorities represented 29% of the pool of prospective jurors, the Court of Appeals found that the pattern of peremptory challenges "strongly support[ed] a *prima facie* case under *Batson:* "

Here, the prosecution's challenge rate against minorities was 50 percent (three of six) in the selection of the jury of 12, and 57 percent (four of seven) in the selection of the jury of 12 plus alternates. Whether this rate creates a statistical disparity would require knowing the minority percentage of the venire; for example, if the minority percentage of the venire was 50, it could be expected that a prosecutor, acting without discriminatory intent, would use 50 percent of his challenges against minorities. Only a rate of minority challenges significantly higher than the minority percentage of the venire would support a statistical inference of discrimination. We are not informed of the minority percentage of the venire in this case, but we may accept as a surrogate for that figure the minority percentage of the population of the Eastern District, from which the venire was drawn. That percentage is 29. *See Alvarado I,* 891 F.2d at 444 & n. 5.

We think a challenge rate nearly twice the likely minority percentage of the venire strongly supports a *prima facie* case under *Batson.* The Government opposes this conclusion, pointing to the prosecution's waiver of a challenge in the fifth round, when minority veniremen were in the jury box, subject to peremptory challenge. Though failure to exercise an available challenge against minority veniremen has been mentioned in the decisions of some courts finding no prima facie case of discrimination, *see United States v. Moore,* 895 F.2d 484, 486 n. 5 (8th Cir. 1990); *United States v. Grandison,* 885 F.2d 143, 148 (4th Cir.1989), *cert. de-*

13. In the first round, the Trial Court invited counsel to exercise their peremptory challenges against all 14 prospective jurors who remained after two were excused on consent. In the second round, the Trial Court subdivided the prospective jurors into a group of four and then a group of three. Petitioner made his *Batson* challenge after peremptories directed at the group of three were made. See pages 584–85, above.

*nied,* 495 U.S. 934, 110 S.Ct. 2178, 109 L.Ed.2d 507 (1990), the fifth round waiver here does not defeat a *prima facie* case. The discrimination condemned by *Batson* need not be as extensive as numerically possible. A prosecutor may not avoid the *Batson* obligation to provide race-neutral explanations for what appears to be a statistically significant pattern of racial peremptory challenges simply by forgoing the opportunity to use all of his challenges against minorities.

923 F.2d at 256. *See also Overton v. Newton, supra,* 295 F.3d at 278 ("[W]e have no doubt that statistics, alone and without more, can, in appropriate circumstances, be sufficient to establish the requisite *prima facie* showing under *Batson.*").

Similarly, in *Truesdale v. Sabourin,* 427 F.Supp.2d 451 (S.D.N.Y.2006), 19 individuals made up the panel of prospective jurors, 14 of whom were African–Americans. As of the time the *Batson* challenge was made, the prosecution had exercised eight peremptory challenges, all of which were directed at African–Americans. The Trial Court concluded that these statistics were insufficient to establish a *prima facie* case under *Batson.* 427 F.Supp.2d at 454–55, and the Appellate Division affirmed the Trial Court's conclusion on direct appeal.

The prisoner then filed a petition for a writ of habeas corpus in this Court. After noting that the burden at the initial step of *Batson* is not a significant one, the Honorable Denise L. Cote, United States District Judge, concluded that petitioner had made a *prima facie* case of a *Batson* violation.

When a defendant relies on statistical arguments to establish a *prima facie* case of discriminatory jury selection, "a rate of minority challenges significantly higher than the minority percentage of the venire would support a statistical inference of discrimination." *Alvarado,* 923 F.2d at 255. At the time the *Batson* challenge was made in this case, the rate of challenges against black members of the venire was 100% (8/8), and the percentage of blacks in the venire was 74% (14/19). Black prospective jurors were thus struck at a rate 36% higher than would be expected if peremptory challenges were exercised randomly across the venire. To be sure, this disparity is far below the greater than 100% difference relied upon by the Second Circuit in *Alvarado, id.* at 256, but that case did not purport to, and should not be read to, establish a minimum threshold for *prima facie* claims of discrimination. Were it otherwise, no inference of discrimination would be possible where members of the targeted group compose more than 50% of the venire.

427 F.Supp.2d at 461.

In this case, as in both *Alvarado* and *Truesdale,* the prosecution used 100% of the peremptory challenges actually exercised up to the time of the *Batson* challenge to strike only African–American prospective jurors despite the fact that African–American prospective jurors made up a significantly smaller percentage of the pool of prospective jurors. Here, that percentage was 52% (11 out of 21). *Alvarado* teaches that this disparity is sufficient to trigger the prosecution's obligation to proffer racially neutral reasons for its challenges.

In support of his position, respondent cites to a number of facts and cases; none of his arguments are convincing.

Like the Trial Court, respondent cites the fact that a number of African–Americans were not challenged (Resp. Op. at 47–48). *Alvarado,* however, expressly rejected this argument:

The discrimination condemned by *Batson* need not be as extensive as numerically possible. A prosecutor may not avoid the *Batson* obligation to provide

race-neutral explanations for what appears to be a statistically significant pattern of racial peremptory challenges simply by foregoing the opportunity to use all of his challenges against minorities.

*United States v. Alvarado, supra,* 923 F.2d at 256. Moreover, this argument misses the point of *Batson. Batson* was intended, among other things, to prohibit the use of a race as a factor in jury selection, regardless of whether a minority is entirely excluded from the jury or the number of minority jury members is merely limited. *See Walker v. Girdich,* 410 F.3d 120, 123 (2d Cir.2005) ("[U]nder *Batson* and its progeny, striking even a single juror for a discriminatory purpose is unconstitutional."); *accord Green v. Travis,* 414 F.3d 288, 297 (2d Cir.2005); *United States v. Vasquez–Lopez,* 22 F.3d 900, 902 (9th Cir. 1994) (stating that "[t]o establish a *prima facie* case, [the defendant] did not need to show that the prosecution had engaged in a pattern of discriminatory strikes against more than one prospective juror. We have held that the Constitution forbids striking even a single prospective juror for a discriminatory purpose."); *Jones v. Ryan,* 987 F.2d 960, 972 (3d Cir.1993) (noting that the striking of even a single juror based on race violates the Constitution); *Reyes v. Greiner,* 340 F.Supp.2d 245, 266 (E.D.N.Y.2004) ("[I]t is settled law that a *Batson* violation occurs where the prosecution or the defendant has been found to have struck a single juror on the basis of race, even where the prosecution or the defendant waived peremptory challenges, leaving other persons of that race on the jury." (citations omitted)).

Next, respondent argues that the result in this case should be governed by the decisions in *Overton v. Newton, supra,* 295 F.3d 270 and *Williams v. Burge, supra,* 2005 WL 2429445 (Resp. Op. at 45–48). Although these cases have some similarity to this case, I conclude that they are both distinguishable and not controlling.

In *Overton* the Second Circuit rejected a claim by a habeas petitioner that a state trial judge had incorrectly concluded there was no *prima facie* case under *Batson.* The petitioner in *Overton* made his *Batson* challenge after two rounds of jury selection and after the prosecution had exercised peremptory challenges against seven of the eleven African–Americans potential jurors and three against non-African-Americans. 295 F.3d at 273–74. The *Batson* challenge was not renewed at the conclusion of jury selection, and the record did not reveal what the actual composition of the jury was. *Overton v. Newton, supra,* 295 F.3d at 279. The Court of Appeals found that the record before it did not establish an unreasonably erroneous decision by the Trial Court, stating:

> Here, the prosecutor used four peremptory challenges in the first round of jury selection and struck two of five African–American potential jurors from the venire. Three African–American jurors were seated. In the second round, there were six African–American potential jurors in the box; one was struck for cause and the other five were excluded as a result of peremptory strikes by the prosecutor. At this point, before jury selection was completed and before the above facts were even fully established on the record, petitioner made his *Batson* challenge. It was at this stage that the trial court denied it; we cannot say that, in doing this, it unreasonably applied the *Batson* principle.

295 F.3d at 279.

In *Williams,* during the first round of jury selection, the prosecutor had used his first five peremptory challenges against African–American potential jurors when the defendant made a *Batson* motion. The

trial judge found that the motion was premature at that point, stating:

I quite frankly feel that a prima facie case has not been made out.... Not at this point. [Five strikes is] not enough, in my judgment, to require the People to present me with non-contextural [*sic*]. It may be when we concluded the selection process for the first 17 that I will revisit the issue, but right now, no.

2005 WL 2429445 at *1. The first round of jury selection then continued, and the prosecutor exercised three additional peremptory challenges, all of which were directed at non-African-American potential jurors. *Williams v. Burge, supra,* 2005 WL 2429445 at *2

Your Honor concluded that the Trial Judge's determination that no *prima facie Batson* claim had been established was not an unreasonable application of federal law. *Williams v. Burge, supra,* 2005 WL 2429445 at *6–7. Although your Honor expressed skepticism concerning whether denial of a *Batson* claim prior to the conclusion of jury selection could ever constitute an unreasonable application of federal law, this does not appear to have been the basis for the decision. *Williams v. Burge, supra,* 2005 WL 2429445 at *6. Rather your Honor distinguished Williams's claim from *Green v. Travis, supra,* 414 F.3d 288 and from *Batson* itself on the ground that not all of the peremptory claims exercised by the prosecution were directed at minorities and the challenges were not used to eliminate an entire minority from the jury. *Williams v. Burge, supra,* 2005 WL 2429445 at *6.

I conclude that both *Overton* and *Williams* are distinguishable because in neither case did the prosecution direct its peremptory challenges solely at African-Americans, as the prosecutor did in this case. Moreover, nothing in *Overton* suggests that the Court of Appeals intended to overrule *Alvarado,* which unequivocally

held that a disproportionate use of peremptory challenges against a minority can satisfy the requirement of a *prima facie* case under *Batson.* Although I appreciate that the Court of Appeals has repeatedly noted that *Batson* claims raised in habeas petitions are entitled to more lenient review than similar claims raised on direct appeals from federal convictions, the rate of challenge here—100% of the challenges exercised against a minority group that made up only 52% of the panel—was sufficiently disparate to at least require the prosecution to proffer a racially neutral reason for its challenges.

Finally, respondent also offers hypothetical racially-neutral reasons for the prosecution's peremptory challenges (Resp. Op. at 52–53). Such after-the-fact suggestions are insufficient to remedy a *Batson* violation. "A *Batson* challenge does not call for a mere exercise in thinking up any rational basis. If the stated reason does not hold up, its pretextual significance does not fade because a trial judge, or an appeals court, can imagine a reason that might not have been shown up as false." *Miller–El v. Dretke,* 545 U.S. 231, 252, 125 S.Ct. 2317, 162 L.Ed.2d 196 (2005); *accord Rogers v. Artuz,* 00 Civ. 2718(JBW), 03 Misc. 0066(JBW), 2007 WL 2815692 at *6 (E.D.N.Y. Sep. 24, 2007).

The prosecutor's disproportionate strikes of black jurors, despite the fact that not all blacks were stricken from the jury, was sufficient to raise an inference of discrimination and, therefore, sufficient to establish a *prima facie* case under *Batson.* Thus, the Trial Court erred in not requiring the prosecutor to offer race-neutral reasons for her peremptory challenges and the appellate divisions' finding otherwise was an unreasonable application of clearly established federal law.

### c. *Relief*

There are three options available to a court in fashioning a remedy for a petitioner's successful habeas claim based on a state court's *Batson* rulings.

> When a state court fails to fulfill its duties under *Batson,* a federal court sitting in habeas review has three options in its selection of a remedy. The federal court may "(1) hold a reconstruction hearing and take evidence regarding the circumstances surrounding the prosecutor's use of the peremptory challenges . . .; (2) return the case to the state trial court on a conditional writ of habeas corpus so that the state court could conduct the inquiry on its own; or (3) order a new trial." *Harris,* 346 F.3d at 347 (citation omitted). There are some limits, however, to the district court's discretion to choose among these remedial options. Most importantly, the Second Circuit has cautioned that "if appropriate findings may be conveniently made" at a reconstruction hearing, "this should be done." *Id.* at 348 (citation omitted). Thus, a district court has the discretion to order a new trial "only where it is demonstrably true that the passage of time has impaired the trial court's ability to make a reasoned determination of the prosecutor's state of mind when the jury was selected." *Id.* (citation omitted).

*Truesdale v. Sabourin, supra,* 427 F.Supp.2d at 462, *see also Tankleff v. Senkowski,* 3 F.Supp.2d 278, 280 (E.D.N.Y. 1998).

Despite the fact that approximately nine years have passed since petitioner's trial, respondent reports that the prosecution is still capable of presenting its reasons for its peremptory challenges at a reconstruction hearing (Resp. Op. at 56–57).

Accordingly, I respectfully recommend that the writ be granted on the basis of petitioner's *Batson* claim unless, within ninety (90) days of the final resolution of this matter, the New York courts conduct a reconstruction hearing concerning the prosecution's non-discriminatory reasons for the exercise of its peremptory challenges.

### 3. *Prosecutor's Introduction of Extrinsic Evidence that Petitioner Was Incarcerated*

Petitioner next claims that his Due Process rights were violated by the prosecution's introduction of extrinsic evidence that petitioner was incarcerated in Florida for a period of time several months before the day of the crime charged (Pet. Mem. at 49). Petitioner argues that not only was the introduction of this evidence in violation of New York state's evidentiary rules, but resulted in a "highly prejudicial inference of criminal propensity" that denied petitioner the right to a fair trial (Pet. Mem. at 49).

### a. *The Trial Testimony*

Petitioner testified on his direct examination that he first met alibi witness John Torres during a two-week visit to Florida in December, 1995 (Trial Tr. at 379–80). Petitioner returned to Florida in January or February of 1996 in the hopes of getting a job with John's father (Trial Tr. at 381). Although, petitioner was unable to obtain work with John's father, he stayed in Florida at the house of a female friend until mid-April (Trial Tr. at 382–84). When asked why he stayed in Florida until April when he had no job, petitioner responded that "honestly I was enjoying being out there. . . . I was having a good time out there" (Trial Tr. at 384). Petitioner further testified that he left Florida in April because he missed his children in New York (Trial Tr. at 384).

On cross-examination, petitioner testified more specifically regarding his living

situation during his trip to Florida from February to April. Petitioner stated that every day, throughout that entire trip, he stayed with his friend, Shannon Beane, until he left for New York in mid-April (Trial Tr. 394–98).

Over defense counsel's objection, the prosecution presented as a rebuttal witness Captain Bruce Bolton of the Volusia County Department of Correction, who testified that petitioner was housed at the Volusia County Department of Corrections from March 13, 1996 until April 12, 1996 (Trial Tr. at 439). The Trial Judge also allowed the introduction of petitioner's Florida arraignment photograph (Trial Tr. 452–54). No evidence was presented regarding the reason for petitioner's incarceration, or the disposition of the Florida case (Pet. Mem. at 50). In addition the jury was not advised that petitioner disclosed the fact of his incarceration in Florida in his written, post-arrest statement (Post–Arrest Stmnt.).

During its summation, the prosecution argued that petitioner should not be believed because he had lied to the jury about his incarceration in Florida, and was, therefore, willing to lie to the jury about his alibi for the day of the murder (Trial Tr. at 535–38). The Trial Judge subsequently instructed the jury that Captain Bolton's testimony was not offered to show guilt or that petitioner has a predisposition to commit crimes, but should be used "only in determining the credibility of witnesses who have appeared before you" (Trial Tr. at 565).

b. *Exhaustion*

On his direct appeal, petitioner, citing the Fourteenth Amendment of the United States Constitution, argued that his due process right to a fair trial was violated by the introduction of Captain Bolton's testimony.

The Appellate Division denied this claim on the merit s, stating:

> The trial court properly exercised its discretion in permitting the People to introduce rebuttal evidence since it tended to disprove defendant's alibi (*see, People v. Harrington,* 262 A.D.2d 220, 694 N.Y.S.2d 354, lv. denied 94 N.Y.2d 823, 702 N.Y.S.2d 593, 724 N.E.2d 385; *see also, People v. Marsh,* 264 A.D.2d 647, 696 N.Y.S.2d 14, lv. denied 94 N.Y.2d 825, 702 N.Y.S.2d 596, 724 N.E.2d 388). While the rebuttal evidence concerned defendant's whereabouts several months prior to the crime, it was not collateral because defendant had made his various travels to Florida over an extended period of time integral parts of his alibi defense. Furthermore, the prejudicial effect of revealing to the jury that defendant had served 30 days in jail for an unspecified offense was minimal, particularly in light of the court's limiting instructions, and was outweighed by the probative value of the rebuttal evidence. In any event, were we to find any error, we would find it harmless in light of the overwhelming evidence of defendant's guilt.

*People v. Rosario, supra,* 288 A.D.2d at 142–43, 733 N.Y.S.2d 405 at 406.

Respondent first argues that petitioner did not properly present his federal claim to the State appellate courts, and, thus, the claim is procedurally barred from habeas review (Resp. Op. at 58). Respondent contends that even though petitioner's brief to the Appellate Division cited to the Fourteenth Amendment of the United States Constitution and claimed that petitioner was denied a fair trial, petitioner failed to explain how the evidence violated his federal Due Process rights (Resp. Op. at 60). Respondent argues that under Second Circuit precedent, petitioner failed to put the state court on the required notice of his

federal claim because to do so he "must demonstrate '(a) reliance on pertinent federal cases employing constitutional analysis, (b) reliance on state cases employing constitutional analysis in like fact situations, (c) assertion of the claim in terms so particular as to call to mind a specific right protected by the Constitution, and (d) allegation of a pattern of facts that is well within the mainstream of constitutional litigation'" (Resp. Op. at 59 *quoting Daye v. Attorney General of State of New York,* 696 F.2d 186, 194 (2d Cir.1982)).

Unlike petitioner here, the petitioner in *Daye* did not, in his briefs to the state courts, cite the provision of the United States Constitution on which he relied. *Daye v. Attorney Gen. of the State of New York, supra,* 696 F.2d at 192. Thus, the issue in *Daye* was how the exhaustion requirement could be met in the absence of an express reference in state court to a provision in the federal constitution. In fact, the Second Circuit expressly stated that "[o]bviously if the petitioner has cited the state courts to the specific provision of the Constitution relied on in his habeas petition, he will have fairly presented his legal basis to the state court." *Daye v. Attorney Gen. of the State of New York, supra,* 696 F.2d at 192. In a more recent opinion, also cited by respondent, the Second Circuit held that a mere reference to a provision of the United States constitution in a point heading of a brief sufficiently asserts a federal claim even where the petitioner's argument only refers to state law. *Davis v. Strack,* 270 F.3d 111, 122 (2d Cir.2001). Petitioner's brief to the Appellate Division contains the exact same text that the Second Court found sufficient in *Davis,* namely, that the evidence of petitioner's incarceration in Florida "DEPRIVED APPELLANT OF HIS DUE PROCESS RIGHT TO A FAIR TRIAL. U.S. CONST., AMEND. XIV" (App. Div. Br. at i). *See Davis v. Strack,* 270 F.3d at 122.

Respondent also argues that petitioner failed to exhaust his federal claim in state court because his letter to the New York State Court of Appeals did not identify any federal, constitutional claims (Resp. Op. at 61). This argument is equally without merit. Petitioner's letter to Chief Judge Kaye uses language substantially identical to that of the petitioner in *Davis,* and requested that the Court of Appeals "consider and review all issues outlined in defendant-appellant's brief" (Jan. 2, 2002 Letter to Chief Judge Kaye, annexed as Ex. 3 to Resp. Op.). *See also Davis v. Strack, supra,* 270 F.3d at 122. "[S]uch a request is 'sufficiently specific' to present any federal constitutional claim set forth in the Appellate Division brief to the state Court of Appeals, regardless of whether the defendant reiterates the claim in any subsequent letter to the court." *Davis v. Strack, supra,* 270 F.3d at 122, *citing Morgan v. Bennett,* 204 F.3d 360, 369–72 (2d Cir.2000). Since petitioner's letter to Judge Kaye used the same language approved by the Second Circuit in *Daye,* petitioner fairly presented his constitutional claim to the Court of Appeals, and he may assert his claim in this court.

Finally, the Appellate Division's opinion clearly disposed of petitioner's evidentiary claim on the merit s. The Appellate Division's judgment discussed the substance of the claim and did not assert any procedural issues. Accordingly, the Appellate Division's judgment is entitled to AEDPA's deferential standard of review, and petitioner cannot obtain habeas relief on this issue unless that decision was either contrary to, or involved an unreasonable application of, clearly established federal law. 28 U.S.C. § 2254(d)(1).

c. *Analysis*

Generally, erroneous evidentiary rulings do not rise to the level of a constitutional

violation—the essential predicate for habeas relief. *Estelle v. McGuire,* 502 U.S. 62, 67–68, 112 S.Ct. 475, 116 L.Ed.2d 385 (1991); *Sims v. Stinson* 101 F.Supp.2d 187, 194 (S.D.N.Y.2000); *Colon v. Johnson,* 19 F.Supp.2d 112, 118 (S.D.N.Y.1998); *Roberts v. Scully,* 875 F.Supp. 182, 189 (S.D.N.Y.), *aff'd,* 71 F.3d 406 (2d Cir.1995); *Alvarez v. Scully,* 833 F.Supp. 1000, 1005 (S.D.N.Y.1993). A habeas court will review a trial court's admission of evidence "[o]nly where evidence 'is so extremely unfair that its admission violates fundamental concepts of justice.'" *Marsh v. Ricks,* 02 Civ. 3449(NRB), 2003 WL 145564, *3 (S.D.N.Y. Jan. 17, 2003) *quoting Dowling v. United States,* 493 U.S. 342, 352, 110 S.Ct. 668, 107 L.Ed.2d 708 (1990). The erroneous admission of evidence will rise to the level of constitutional error only where the petitioner can show that it deprived him of a fundamentally fair trial, and in this way, of due process of law. *See Taylor v. Curry,* 708 F.2d 886, 891 (1983); *Alvarez v. Scully, supra,* 833 F.Supp. at 1005–06. To amount to a denial of due process, the evidence in question must have been "'sufficiently material to provide the basis for conviction or to remove a reasonable doubt that would have existed on the record without it.'" *Dunnigan v. Keane,* 137 F.3d 117, 125 (2d Cir.1998), *quoting Johnson v. Ross,* 955 F.2d 178, 181 (2d Cir.1992); *Collins v. Scully,* 755 F.2d 16, 18–19 (2d Cir.1985); *see also Mitchell v. Herbert,* 97 Civ. 5128(DC), 1998 WL 186766 at *5 (S.D.N.Y. April 20, 1998). Even if such constitutional error is established, habeas relief is warranted only where the petitioner demonstrates that the error had a "'substantial and injurious effect or influence in determining the jury's verdict.'" *Brecht v. Abrahamson,* 507 U.S. 619, 637–38, 113 S.Ct. 1710, 123 L.Ed.2d 353 (1993), *quoting Kotteakos v. United States,* 328 U.S. 750, 776, 66 S.Ct. 1239, 90 L.Ed. 1557 (1946).

Counsel who seeks to challenge the credibility of a witness' testimony on a collateral matter generally may not introduce extrinsic evidence, such as calling a subsequent witness, to contradict answers given by the witness whose credibility is under attack. *See* 4 Jack B. Weinstein & Margaret A. Berger, *Weinstein's Federal Evidence* § 607.06[3][a] (Joseph M. McLaughlin, ed., Matthew Bender 2d ed.2007). Petitioner argues that the Trial Court erred by allowing the rebuttal testimony of Captain Bolton because his testimony "was collateral and used only to challenge Petitioner's credibility" (Pet. Mem. at 53). However, it is not necessarily erroneous to permit a witness to testify for the purpose of impeaching another witness' testimony; "[t]he determinative question in deciding whether extrinsic evidence contradicting a witness' testimony is admissible is not whether the contradicting extrinsic evidence is material, but rather whether the assertions that the impeaching party seeks to contradict are themselves material or collateral." *Rosario v. Kuhlman,* 839 F.2d 918, 925–26 (2d Cir. 1988); *see also People v. Schwartzman,* 24 N.Y.2d 241, 245, 299 N.Y.S.2d 817, 821, 247 N.E.2d 642, 644 (1969) ("[W]hen a witness testifies concerning a fact material to the case, he may be contradicted either by cross-examination or by introduction of other evidence."). Facts that are relevant to a case for reasons other than mere credibility are material and not collateral. *Rosario v. Kuhlman, supra,* 839 F.2d at 926.

Petitioner testified on his direct examination that he made three separate trips to Florida in an attempt to make a life for himself there (Trial Tr. at 380–83). It was during these visits to Florida that petitioner came to know his alibi witnesses, John Torres and Jenine Seda. During his second visit, from February to mid-April of 1996, petitioner testified that he stayed at a

friend's house near the home of John Torres and Jenine Seda, both of whom he saw frequently during that time (Trial Tr. at 383). Petitioner's presence in John and Seda's neighborhood and his frequent association with them for the entirety of his second trip to Florida would tend to show that John and Seda were more capable then they might otherwise be of vouching for Petitioner's whereabouts during his third trip in June. Thus, petitioner made his second sojourn in Florida a relevant material piece of his alibi defense. Moreover, when the prosecution cross-examined petitioner about the specifics of where he stayed in Florida from March to April, defense counsel made no objections to the relevancy of those questions. Since petitioner's whereabouts from March through April of 1996 were material and relevant to his alibi defense, the Trial Court did not err by permitting the introduction of extrinsic evidence to contradict petitioner's testimony on that matter.

Not only was it permissible to introduce extrinsic evidence impeaching petitioner's testimony about his living arrangements because it was relevant testimony, but the evidence was also admissible because petitioner had opened the door for its introduction. Petitioner testified on direct examination that he "stayed [at Ms. Beane's house] until April," and the reason why he remained in Florida until the middle of April, even though he had not found employment, was because he was "having a good time" (Trial Tr. at 384). "[W]here a defendant, in his direct testimony, falsely states a specific fact, the prosecution will not be prevented from proving, either through cross-examination or by calling its own witnesses, that he lied as to the fact." *United States v. Beno*, 324 F.2d 582, 588 (2d Cir.1963) *citing Walder v. United States*, 347 U.S. 62, 74 S.Ct. 354, 98 L.Ed. 503 (1954); *accord United States. v. Benedetto*, 571 F.2d 1246, 1250 (2d Cir.1978). This is so regardless of whether the issue is collateral, as "a defendant should not be allowed to profit by a gratuitously offered misstatement." *United States v. Beno, supra*, 324 F.2d at 588. Because petitioner testified falsely on his direct examination about where and why he stayed in Florida during his second trip, it was not improper for the Trial Judge to permit the prosecution to offer Captain Bolton's testimony regarding petitioner's incarceration.[14]

Petitioner also argues that there was no need for the prosecution's rebuttal evidence because Rosario was not dishonest in his testimony—"no one could have reasonable expected petitioner to testify that he 'stayed' in a county jail when asked where he lived during his second trip to Florida. It is entirely consistent to 'live' in a residence while being 'held' in a correctional facility" (Pet. Mem. at 54). Even if I were to accept this logic, the argument still overlooks the nature of petitioner's testimony during his cross-examination:

Q: How long did you stay with Miss Beane?

A: I stayed at her house until I came back to New York City.

Q: And you were in her house for the entire time?

A: Yes.

Q: And that was from March or February?

**14.** Petitioner cites *People v. Goggins*, 64 A.D.2d 717, 717–18, 407 N.Y.S.2d 531, 532 (2d Dep't 1978), for the proposition that that a prosecution's introduction of extrinsic evidence of a collateral issue to attack a defendant's credibility deprives the defendant of a fair trial (Pet. Mem. at 52). That case, however, involved extrinsic evidence that challenged testimony the defendant gave only on cross-examination. *People v. Goggins, supra*, 64 A.D.2d at 717, 407 N.Y.S.2d at 531. The case at bar is distinguishable in that petitioner testified falsely during both his direct and his cross-examinations.

A: From February.

Q: Until March?

A: It's passed March.

Q: Into April in fact, isn't that correct?

A: Yes.

Q: And during that time from February when you arrived there until you left for New York in April, you are telling this jury you were living with Miss Beane?

A: I was staying with her. That's correct.

Q: And you would stay there on a daily basis, correct?

A: Yes.

. . .

Q: You weren't staying with Johnny Torres in April?

A: No, I was not. I was staying with Shannon. I came back on the 15th. I got here a Monday [*sic*]. No, I got here on Sunday. It was the 14th. I started working on the Monday. That's how come I remember that date.

Q: But, for the first two weeks in April—

A: Yes

Q: When you were—

A: No. I was staying with Shannon and, yes, I did see Johnny.

Q: So, Mr. Rosario, for those first two weeks of April that you were in Florida—

A: yeah.

Q:—you were with Shannon and not with Johnny Torres, is that correct?

A: No, I wasn't, but I did see Johnny in Florida.

Q: In March of 1996, you were in Florida, correct?

A: Yes.

Q: And again, you were with Shannon and Not Johnny Torres?

A: Correct

(Trial Tr. 394–98). Petitioner did not just testify that he "stayed" and "lived" with Ms. Beane while he was incarcerated. Petitioner agreed that from February until he left Florida in mid-April, he was "in [Ms. Beane's] house for the entire time," and that he would "stay [at Ms. Beane's house] on a daily basis" (Trial Tr. at 394–397). I cannot agree that petitioner's testimony regarding his whereabouts from March until mid-April of 1996 was truthful or even substantially truthful; the simple truth is that even though petitioner stayed with Ms. Beane during his second trip to Florida, the last month of that trip was spent not at her home, but in a correctional facility. Thus, petitioner's testimony during cross, coupled with his misleading testimony on direct (discussed on page 83, above) gave cause for the prosecution's rebuttal evidence.

Petitioner also asserts that the rebuttal evidence rendered his trial unfair and violated his Due Process rights because as a result of that evidence "the jury inevitably perceived him as a bad person with the propensity to commit crimes, such as the murder at issue" (Pet. Mem. at 53). To protect petitioner from such an adverse inference, the Trial Judge issued a limiting instruction to the jurors that they were not to consider evidence of Rosario's incarceration as evidence of a propensity to commit crimes (Trial Tr. at 565). Jurors are presumed to abide by a trial judge's instructions to limit consideration of evidence. *Zafiro v. United States*, 506 U.S. 534, 540–41, 113 S.Ct. 933, 122 L.Ed.2d 317 (1993) ("[J]uries are presumed to follow their instructions" *quoting Richardson v. Marsh*, 481 U.S. 200, 211, 107 S.Ct. 1702, 95 L.Ed.2d 176 (1987)); *accord United States v. Stewart*, 433 F.3d 273, 307 (2d

Cir.2006) (noting it is a "well-settled proposition" that jurors are presumed to follow limiting instructions). Petitioner argues that a limiting instruction such as this, "does little—if anything—to mitigate the severe and wholly unnecessary prejudice that subsequently infected the trial" (Pet. Mem. at 54). As petitioner points out, in some situations a limiting instruction to a jury is unlikely to prevent the average juror from inferring that a prior conviction shows a defendant has the propensity to commit the crime with which he is charged (Pet. Mem. at 54 *citing United States v. Puco,* 453 F.2d 539, 542 (2d Cir.1971)). Such an inference, despite a limiting instruction, is likely to arise where the government seeks to impeach a criminal defendant with evidence of a conviction for a crime similar to the crime with which he or she is currently being tried. *See United States v. Puco, supra,* 453 F.2d at 542; *United States v. Ortiz,* 553 F.2d 782, 784 (2d Cir.1977). The prejudicial effect of evidence of prior crimes is also more likely to substantially outweigh its probative value when the prior crime "negates credibility only slightly." *United States v. Puco, supra,* 453 F.2d at 542 *quoting United States v. Palumbo,* 401 F.2d 270, 273 (2d Cir.1968); *see also Simmons v. Ross,* 965 F.Supp. 473, 480 (S.D.N.Y.1997).

Evidence of petitioner's Florida incarceration at his murder trial does not, however, rise to the level of being substantially prejudicial under either theory. A month-long incarceration, regardless of what a juror may infer regarding its cause, is unlikely to be perceived by a juror as suggesting that a defendant committed murder, attempted murder or another similar violent offense. Evidence of petitioner's incarceration was also probative of petitioner's credibility, since it served to impeach his testimony that he was living with a friend during the time he was in jail. Thus, the prosecution's rebuttal evidence did not result in unfair prejudice

that substantially outweighed the evidence's probative value, and it did not render petitioner's trial fundamentally unfair in violation of his Due Process rights.

Lastly, it is of no moment that the jury was not informed that petitioner had initially told the police about his incarceration in Florida. The fact that petitioner reported his incarceration to the police is irrelevant to whether petitioner mislead the jury at trial. Petitioner fails to explain how informing the jury of this information could have rehabilitated him.

For all the foregoing reasons, I conclude that the Appellate Division's decision that the Trial Judge properly acted within his discretion when he allowed the prosecution's rebuttal evidence was not contrary to, or an unreasonable application of, clearly established federal law. Thus, this claim should be denied.

### 4. Actual Innocence Claim

Finally petitioner claims that his habeas petition should be granted because he is actually innocent of the murder for which he was convicted. This claim is denied on the merit s.

The doctrine of actual innocence in habeas claims developed to prevent a "miscarriage of justice" where procedural rules might otherwise prevent a federal court from considering a claim by a petitioner who is factually innocent of the crime for which he or she was convicted. *Schlup v. Delo,* 513 U.S. 298, 115 S.Ct. 851, 130 L.Ed.2d 808 (1995), *citing Murray v. Carrier,* 477 U.S. 478, 495, 106 S.Ct. 2639, 91 L.Ed.2d 397 (1986); *Kuhlmann v. Wilson,* 477 U.S. 436, 106 S.Ct. 2616, 91 L.Ed.2d 364 (1986); *Smith v. Murray,* 477 U.S. 527, 106 S.Ct. 2661, 91 L.Ed.2d 434 (1986). The doctrine mitigates the harshness of procedural requirements intended to protect the interests of finality and comity that are threatened by successive or un-

timely federal review of state convictions. *Doe v. Menefee,* 391 F.3d 147, 160 (2d Cir.2004).

Petitioner's claim of actual innocence was not raised in state court and is asserted for the first time in his habeas petition. However any procedural default that might otherwise exist would not bar a meritorious claim of actual innocence.[15] *Doe v. Menefee, supra,* 391 F.3d at 161, *citing Schlup v. Delo, supra,* 513 U.S. at 315–17, 115 S.Ct. 851.

To prevail on a claim of actual innocence, a petitioner must present new reliable evidence in light of which it is more likely than not that no reasonable juror would have convicted petitioner. *Schlup v. Delo, supra,* 513 U.S. at 327, 115 S.Ct. 851; *accord Murden v. Artuz,* 497 F.3d 178, 194 (2d Cir.2007). *See also House v. Bell, supra,* 126 S.Ct. at 2078 (upholding the *Schlup* standard to defaulted habeas claims despite the passage of AEDPA-). To meet the *Schlup* standard, a petitioner must "support his allegations of constitutional error with new reliable evidence— whether it be exculpatory scientific evidence, trustworthy eyewitness accounts, or critical physical evidence—that was not presented at trial." *Schlup v. Delo, supra,* 513 U.S. at 324, 115 S.Ct. 851; *accord Guity v. Ercole,* 07 Civ. 728(RPP), 2007 WL 3284694 at *8 (S.D.N.Y. Nov. 6, 2007). Thus, a reviewing court that determines new evidence is reliable must analyze the claim of innocence in light of the entire record, including evidence that may have been inadmissible at trial. *Doe v. Menefee, supra,* 391 F.3d at 162. After, making its own credibility assessments, if the court then concludes it is more likely than not that no reasonable juror would have found petitioner guilty beyond a reasonable doubt, the actual innocence standard is satisfied and the court may review the constitutional challenge. *Doe v. Menefee, supra,* 391 F.3d at 163; *accord Sacco v. Greene,* 04 Civ. 2391(CLB), 2007 WL 432966 at *7 (S.D.N.Y. Jan. 30, 2007).

In support of petitioner's actual innocence claim, petitioner cites the total of nine witnesses (Jenine Seda, John Torres, and the seven witnesses presented at his post-conviction hearing) who testified regarding petitioner's presence in Florida on or around the date of the murder. Petitioner also relies on the documentary evidence that petitioner was stopped by police in Florida on May 30 and traveled by bus from Florida to New York on June 30 (Pet. Mem. at 57). Petitioner argues that in light of the totality of the evidence, no reasonable juror would find that petitioner returned to New York from Florida after May 30, failed to contact his fiancée, Minerva Godoy and their children, engaged in a random argument with the victim after which he shot the victim in the head, and traveled back to Florida only to return days later and turn himself in to the police. In addition, in order to find petitioner guilty, a juror would have to find that John Torres, Jenine Seda, Fernando Torres and Chenoa Ruiz all lied under oath when testifying that they each saw petitioner in Florida on June 19 (Pet. Mem. at 57–58).

As I stated in my analysis of petitioner's ineffective assistance of counsel claim, the totality of evidence presented at petitioner's trial and post-conviction hearing raised a reasonable probability that the jury could have found petitioner not guilty of murder had Fernando and Chenoa testified. However, in assessing all of the evidence presented at petitioner's trial and post-conviction hearing, I cannot conclude petitioner's evidence satisfies the substan-

---

**15.** This is true even after the passage of AEDPA, which codifies aspects of the actual innocence doctrine in provisions not relevant to this case. *See Doe v. Menefee, supra,* 391 F.3d at 161 *citing* 28 U.S.C. §§ 2244(b); 2254(e)(2).

tially higher standard necessary to sustain a claim of actual innocence. *Murden v. Artuz, supra,* 497 F.3d at 194 (Actual innocence "requires a stronger showing than the showing of prejudice necessary to prevail on an ineffective assistance claim." (internal quotation marks omitted)). Petitioner's evidence does not show that it is more likely than not that no reasonable juror could have found petitioner guilty for the June 19 murder.

First, in light of the evidence, it would not be unreasonable for a juror to find that petitioner was in fact in Florida in June of 1996, then returned to New York in the middle of the month, only to flee after the commission of Collazo's murder. Petitioner freely admitted that he traveled back and forth to Florida on a number of occasions with only brief stays in New York between those trips (Trial Tr. at 377–80, 386–87, 399). It is likewise not implausible that petitioner would immediately flee New York after committing a murder and later turn himself in to the police, who were already looking for him, in the hope of prevailing on an alibi defense. At trial the prosecution's eyewitnesses, Sanchez and Davis, testified that they were very confident when recognizing petitioner as the shooter (Trial Tr. at 165, 66), and their testimony has not been impeached. John Torres, Jenine Seda and Chenoa Ruiz were all part of a group of friends to which petitioner belonged, and Fernando Torres is the father of two of those friends. Thus these alibi witnesses were all still subject to impeachment based on their relationship to petitioner. In light of all the evidence. I cannot conclude that no reasonable juror would credit the prosecution's witnesses over the greater number of defense witnesses. *See* 1 Hon. Leonard B. Sand, John S. Siffert, Walter P. Loughlin & Steven A. Reiss, *Modern Federal Jury Instructions* Inst. 4–3 (2005) (A jury is free to credit the side offering a smaller number of witnesses.).

Furthermore, in making an actual innocence determination the habeas court must determine "whether the new evidence on which the actual innocence claim is based is reliable." *Doe v. Menefee, supra,* 391 F.3d at 165. Chenoa's testimony at petitioner's 440 hearing appears to conflict with John Torres' testimony at petitioner's trial. Chenoa testified that she recalled seeing petitioner and John at Seda's house on June 19 because she had taken Seda to a doctor's appointment at approximately 11:30 a.m. and did not return until later in the afternoon (Hrg. Tr. at 548, 550). John testified that Seda worked on June 19 (Trial Tr. at 349). In addition, while the prosecution's witnesses testified to events that occurred over two years prior, petitioner's post-conviction hearing witnesses testified to events that occurred about six years prior. Even where petitioner's witnesses may have absolutely no intention of misleading the court, six-year old memories are inherently not as reliable as two and a half-year old ones.

Thus, petitioner has failed to establish that "in light of all the evidence, it is more likely than not that no reasonable juror would have convicted him," and his claim of actual innocence should be denied. *See Bousley v. United States,* 523 U.S. 614, 623, 118 S.Ct. 1604, 140 L.Ed.2d 828 (1998).

## IV. *Conclusion*

Accordingly, for all the foregoing reasons, I respectfully recommend that petitioner's petition for a writ of habeas corpus be granted with respect to his claim that the prosecutor's use of peremptory challenges established a *prima facie* case of racial discrimination unless within ninety (90) days of the final resolution of this proceeding, the New York State courts conduct a reconstruction hearing and conclude that race did not play a role in the

prosecution's exercise of its peremptory challenges. I recommend that the habeas petition be denied with respect to petitioner's claims that (1) he received ineffective assistance of counsel, (2) the Trial Court erred in allowing the prosecutor to introduce extrinsic evidence of his Florida incarceration, and (3) the evidence demonstrates he is actually innocent of the crime.

Since petitioner has made a substantial showing of the denial of a constitutional right with respect to his claim of ineffective-assistance, I also recommend that a certificate of appealability be issued for that claim but that no certificate of appealability be issued for his evidentiary and actual innocence claims. 28 U.S.C. § 2253. To warrant the issuance of a certificate of appealability, "petitioner must show that reasonable jurists could debate whether ... the petition should have been resolved in a different manner or that the issues presented were adequate to deserve encouragement to proceed further." *Middleton v. Attorneys Gen.*, 396 F.3d 207, 209 (2d Cir.2005) (*per curiam*) (internal quotation marks omitted); *see also Love v. McCray*, 413 F.3d 192, 195 (2d Cir.2005) (*per curiam*). For the reasons set forth above, I conclude that there could be a difference of opinion among reasonable jurists that petitioner's federal rights were violated with respect to his ineffective-assistance claim, but not with respect to his evidentiary or actual innocence claims.

V. *Objections*

Pursuant to 28 U.S.C. § 636(b)(1)(C) and Rule 72(b) of the Federal Rules of Civil Procedure, the parties shall have ten (10) days from the date of this Report and Recommendation to file written objections. *See also* Fed.R.Civ.P. 6(a) and 6(e). Such objections (and responses thereto) shall be filed with the Clerk of the Court, with courtesy copies delivered to the chambers of the Honorable P. Kevin Castel, United States District Judge, 500 Pearl Street, Room 2260, New York, New York 10007, and to the chambers of the undersigned, 500 Pearl Street, Room 750, New York, New York 10007. Any requests for an extension of time for filing objections must be directed to Judge Castel. FAILURE TO OBJECT WITHIN TEN (10) DAYS **WILL** RESULT IN A WAIVER OF OBJECTIONS AND WILL PRECLUDE APPELLATE REVIEW. *Thomas v. Arn*, 474 U.S. 140, 106 S.Ct. 466, 88 L.Ed.2d 435 (1985); *IUE AFL–CIO Pension Fund v. Herrmann*, 9 F.3d 1049, 1054 (2d Cir.1993); *Frank v. Johnson*, 968 F.2d 298, 300 (2d Cir.1992); *Wesolek v. Canadair Ltd.*, 838 F.2d 55, 57–59 (2d Cir.1988); *McCarthy v. Manson*, 714 F.2d 234, 237–38 (2d Cir.1983).

Dec. 28, 2007.